ANNETTE KINGSLAND ZIEGLER, J.
*419 ¶1 This is a review of a published decision of the court of appeals, State v. Langlois, 2017 WI App 44, 377 Wis. 2d 302, 901 N.W.2d 768, affirming the Washington County circuit court's[1] judgment of conviction for Joseph T. Langlois ("Langlois") for homicide by negligent handling of a dangerous weapon, contrary to *420 Wis. Stat. § 940.08(1) (2015-16),[2] and its denial of Langlois' postconviction motions.
¶2 On February 4, 2014, Langlois and his brother, Jacob, got into a fight. The fight turned physical and Langlois, having picked up a fillet knife from a nearby nightstand, stabbed Jacob, fatally injuring him. The State charged Langlois with first-degree reckless homicide by use of a dangerous weapon, contrary to Wis. Stat. § 940.02(1), and, at trial, sought conviction on any one of three offenses: the offense charged, or either of two lesser-included offenses, second-degree reckless homicide by use of a dangerous weapon, contrary to Wis. Stat. § 940.06(1), or homicide by negligent handling of a dangerous weapon, contrary to Wis. Stat. § 940.08(1). The jury found Langlois guilty of homicide by negligent handling of a dangerous weapon.
¶3 Post-conviction, Langlois filed two motions, both of which challenged the sufficiency of the evidence and the jury instructions relating to Langlois' defenses of accident and self-defense. Langlois argued that omissions in the jury instructions were reversible error on any one of three grounds: ineffective assistance of counsel, due process violation, or interest of justice. The circuit court denied both motions, concluding that the evidence was sufficient and that the jury instructions were not erroneous. Langlois appealed.
¶4 The court of appeals affirmed. Langlois, 377 Wis. 2d 302, ¶¶1, 51, 901 N.W.2d 768. It held that the circuit "court's instructions to the jury, when viewed in their entirety and not in isolation, were not erroneous." Id., ¶36. It therefore concluded that trial counsel was not ineffective *421 because failure to object to correct instructions is not deficient performance; that there was no due process violation; and that Langlois was not entitled to a new trial in the interest of justice. Id., ¶¶36-37. The court of appeals also concluded that *816 the evidence was sufficient to support the verdict because a rational jury could have found that the knife was a dangerous weapon; that the way Langlois handled the weapon constituted criminal negligence; and that Langlois had not acted in self-defense where he had had the opportunity to leave the room without using force. Id., ¶¶48-49, 51. Langlois petitioned for review.
¶5 On review, we consider two issues. First, we consider whether the jury instructions were erroneous. We conclude that they were not, because, taken as a whole, they accurately state the law. Consequently, we conclude that there is no basis for Langlois' claim of ineffective assistance of counsel, there is no due process violation, and reversal in the interest of justice is not appropriate. Second, we consider whether there was sufficient evidence to support the jury's verdict. We conclude that there was, because the evidence, viewed most favorably to sustaining the conviction, supports a finding of guilt beyond a reasonable doubt.
¶6 Thus, we affirm the decision of the court of appeals.
I. FACTUAL AND PROCEDURAL BACKGROUND
¶7 The events of February 4, 2014, are not subject to significant dispute.[3] Langlois, then 17 years old, had stayed home from school that day, and Jacob, *422 then 20 years old, was home packing some things before leaving for the military.[4] When Karen, their mother, came home from work at about 1:40 p.m., they were both in their rooms. She checked on Langlois first, who told her that Jacob was packing for boot camp and that he was packing some items that did not belong to him, including Langlois' Xbox and one of their father's fillet knives.[5] This behavior was not atypical of Jacob, who had a tendency to take things that did not belong to him.[6]
¶8 Karen then went to check on Jacob, whose room was right next to Langlois'. She asked him about taking things that did not belong to him and Jacob became agitated. Langlois walked into Jacob's room at that point, picked up the Xbox, and walked out. Karen then asked Jacob to give her the fillet knife, which he did, and she set it down-in its sheath-on a nearby nightstand. Langlois was heading back into the room at that point, but Jacob started pushing the door closed. Langlois, however, was able to push his way into the room and demanded to see what else Jacob had of his. Jacob then jumped on Langlois from behind and put him in a chokehold; after a few seconds Langlois capitulated and Jacob let go.
¶9 Langlois came up with the fillet knife in his right hand-now unsheathed-held up near his right *423 shoulder, pointing out. Jacob and Langlois were yelling at one another and Jacob kicked Langlois. Langlois fell back and Jacob moved forward; Langlois caught himself and collided with Jacob, piercing the upper left side of Jacob's chest with the knife. Jacob stood up *817 and stepped back, and Karen, seeing some blood on Langlois' leg, moved forward to check to see if Langlois was injured. Jacob, now grabbing the side of his chest, said "No, mom, it's me." Karen turned, saw the wound, and rushed out of the room to call 9-1-1. Jacob walked out to the kitchen, at first standing by the counter, then sitting in a chair; when he fell unconscious, Langlois helped Karen lay Jacob on the floor and began CPR.
¶10 Deputy Scott Nauman of the Washington County Sheriff's Department responded to the 9-1-1 call. He arrived to the house approximately two minutes after the call, announced his presence as he entered through the open garage, and moved toward the kitchen where he saw Langlois administering CPR to Jacob, who was lying in a large pool of blood. Nauman asked Langlois, "[w]ho did this to him," to which Langlois responded "I did."[7] Nauman placed Langlois under arrest, directed Karen to take over administering CPR, and escorted Langlois out to his squad car.
¶11 On February 6, 2014, the State filed its criminal complaint charging Langlois with one count of first-degree reckless homicide, use of a dangerous weapon, contrary to Wis. Stat. § 940.02(1). On July 16, 2014, the State filed an information alleging the same. On August 27, 2014, Langlois pled not guilty and the case proceeded to trial.
*424 A. Trial Testimony
¶12 On July 14, 2015, trial began. Over the course of three days, the jury heard testimony from 18 witnesses.
1. State witnesses
¶13 Deputy Nauman, as noted above, was the first responder to the scene. Nauman testified that, as he was taking Langlois out of the house, the second responding officer, Washington County Sheriff's Deputy Jesse Williams, was coming in with his medical kit. After securing Langlois in the back seat of the squad car, Nauman returned to the house and helped Williams render aid to Jacob. Nauman testified that there was a lot of blood on the floor, but no more blood was coming out of the puncture site, and that Jacob was having trouble breathing at that point.
¶14 Deputy Christopher Killey of the Washington County Sheriff's Department was the third officer to arrive to the scene and testified that he took up watching over Langlois, who was still seated in the back of Nauman's patrol car. Observing the blood on Langlois' clothing, Killey asked Langlois if he was injured and Langlois replied that he was not. Killey testified that he then asked Langlois for his name, to which Langlois responded: "what does it matter? I stabbed my brother. I stabbed my brother."
¶15 Detective James Wolf and Investigator David Klopfenstein, both of the Washington County Sheriff's Department, were also at the scene. Wolf was tasked with processing the scene while Klopfenstein interviewed Karen. Klopfenstein testified that Karen *425 appeared calm,[8] that she agreed to accompany him to the Hartford Police Department to make a statement, and that she never used the term "accident" or "self-defense" in either her oral or written statements. Wolf testified that he did a walk-through of the house, observing "a large pool of blood" on the kitchen floor and blood drops on the floor in Jacob's bedroom. Also on the floor in Jacob's bedroom were the fillet knife and *818 knife sheath, which he collected as evidence.[9] Wolf testified that the knife had an approximately six-inch blade, and that the blade had blood on it.
¶16 Dr. Zelda Okia, the medical examiner who conducted the autopsy on Jacob, testified that, to a reasonable degree of medical certainty, the cause of death was a puncture wound, six inches deep, on the left side of his chest between his second and third ribs. On cross-examination, Dr. Okia acknowledged that she could not tell from the autopsy whether the knife had been thrust into Jacob or whether Jacob had fallen onto it.
¶17 Detective Joel Clausing of the Washington County Sheriff's Department-the State's final witness-conducted the interview of Langlois. The interview was videotaped[10] and proceeded in essentially three parts: a verbal interview, a written statement, and a reenactment. Clausing testified that Langlois said he had grabbed the knife because he wanted to make Jacob feel "scared so he could back down"; and that *426 Langlois said he was angry and that he had stabbed Jacob because "he kicked me and I just reacted. I mean, there's no thinking about it. It was just reaction." Clausing also testified that during the reenactment, Langlois demonstrated a forward motion with his arm, and the State admitted photos showing a frame-by-frame capture of this part of Langlois' demonstration.
2. Defense witnesses[11]
¶18 The first witness for the defense was the family attorney who helped the Langloises in the initial aftermath to understand the criminal process Langlois was subject to. He testified that when he met with Karen a few weeks after the incident to go over the statements she and Langlois had made to the police, Karen told him that both statements were "really incomplete," and that the stabbing had been an accident. He testified that he then arranged a second meeting with the police, during which Karen told Detective Clausing and Investigator Klopfenstein that Jacob had had "wild eyes" and that Langlois had jack-knifed forward after being kicked, which is what caused the stabbing.[12]
¶19 Langlois testified next. In addition to testifying to the facts of the altercation given above, Langlois corroborated the testimony of Nauman and Killey, *427 confirming that he said "I did" in response to Deputy Nauman's question "who did this," and that he told Deputy Killey "I stabbed him." Langlois also testified that he was aware of what a fillet knife is; that he knew the knife was sheathed because it was sharp; that he picked the fillet knife up and unsheathed it; and that, when he collided with Jacob, the knife pierced Jacob's chest. He testified that afterwards he grabbed two first aid kits and ran after Jacob to the kitchen where he saw "something that [he] won't be able to forget ever, the blood just squirting out of [Jacob] at a really high speed and really fast all in like one or two seconds." Langlois testified that it was not his intent to physically hurt *819 Jacob, but rather that he had picked up the knife "[t]o get him to stop and stop attacking me and my mom. ... [Jacob] was really angry and I wanted him to stop being extremely angry towards me. And I was pretty much just afraid of being put in another choke hold as well." He said that what happened was an accident, but admitted on cross-examination that nowhere in his statement to the police did he use the word "accident" or "self-defense," and that he could have walked out of the room but did not because he was "furious."
¶20 The defense then called seven character witnesses, all of whom testified that Langlois was an involved and contributing member of the community. Five also testified that Langlois was an intelligent individual. The defense closed its case with the testimony of Karen and Steven Langlois-the parents of the victim and of the defendant.
¶21 Steven testified that Jacob had an "explosive" temper, and that Jacob had, in the past, punched through windows and kicked walls and doors. On one occasion, Jacob had even physically attacked Steven.
*428 Steven testified that he had no such problems with Langlois, however; Langlois did his school work and was in advanced placement classes, had a job, was in scouts, was taking flying lessons, and generally did everything that was asked of him. He further testified that, in general, the brothers had a typical sibling relationship-"Will you stop touching me, that kind of stuff ... never [ ] any violent acts." Karen, in addition to testifying to the facts of the altercation given above, verified that Jacob had acted out aggressively-and in one instance, with Steven, physically-in the home and at school.
3. Rebuttal witnesses
¶22 In rebuttal, the State called Sergeant Amy Swan, Jacob's recruiter from the National Guard. She testified that Jacob had always been respectful in her interactions with him, but admitted on cross-examination that she had not spoken with Jacob's parents or reviewed his school disciplinary record in evaluating his fitness for service.
B. Jury Instructions
¶23 At the close of evidence, the State requested instruction on the charged offense-first-degree reckless homicide by use of a dangerous weapon-and on two lesser-included offenses-second-degree reckless homicide by use of a dangerous weapon[13] and homicide by negligent handling of a dangerous *429 weapon.[14] It also requested the instruction regarding retreat.[15] The defense requested instruction on both self-defense[16] and the defense of accident.[17] The circuit court granted these requests and instructed the jury, in relevant part, as follows:
The information in this case ... charged the Defendant with first degree reckless homicide use of a dangerous weapon and you must first consider whether the Defendant is guilty of that offense.
If you are not satisfied that the Defendant is guilty of first degree reckless homicide, you must consider whether or not the Defendant is guilty of second *820 degree reckless homicide use of a dangerous weapon, which is a less serious degree of criminal homicide.
If you are not satisfied that the Defendant is guilty of first degree reckless homicide or guilty of second degree reckless homicide, then you must consider whether or not the Defendant is guilty of homicide by negligent handling of a dangerous weapon, which is a less serious offense than either first or second degree reckless homicide.
1. First-degree reckless homicide, use of a dangerous weapon
¶24 After defining first-degree reckless homicide per Wis. Stat. § 940.02(1), the circuit court discussed self-defense:
Self defense is an issue in this case. In deciding whether the Defendant's conduct was criminally reckless conduct which showed utter disregard for human *430 life or was criminally negligent conduct, you should also consider whether the Defendant acted in lawful self defense.
The law of self defense allows the Defendant to threaten or intentionally use force against another only if the Defendant believed that there was an actual or [imminent] unlawful interference with the Defendant's person and the Defendant believed that the amount of force the Defendant used or threatened to use was necessary to prevent or terminate the interference and the Defendant's beliefs were reasonable.
The Defendant may intentionally use force, which is intended or likely to cause death or great bodily harm, only if the Defendant reasonably believes that the force used was necessary to prevent [imminent] death or great bodily harm to himself. A belief may be reasonable, even though mistaken.
In determining whether the Defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the Defendant's position under the circumstances that existed at the time of the alleged offense.
The reasonableness of the Defendant's beliefs must be determined from the standpoint of the Defendant at the time of the Defendant's acts and not from the viewpoint of the jury now.
The court then gave the instruction on retreat:
Let's talk about this issue of retreat. There is no duty to retreat, however, in determining whether the Defendant reasonably believed the amount of force used was necessary to prevent or terminate the interference, you may consider whether the Defendant had an opportunity to retreat with safety and whether such retreat was feasible and whether the Defendant knew of the opportunity to retreat.
*431 After reciting the second element of first-degree reckless homicide-which includes a definition of "criminally reckless conduct" as "conduct [that] created a risk of death or great bodily harm to another person and the risk of death or great bodily harm was unreasonable and substantial"-but before reciting the third, the court further stated:
You should consider the evidence relating to self defense in deciding whether the Defendant's conduct created ... an unreasonable risk to another. If the Defendant was acting lawfully in self defense, his conduct did not create an unreasonable risk to another.
The burden is on the State to prove beyond a reasonable doubt that the Defendant did not act lawfully in self defense. And you must be satisfied beyond a reasonable doubt from all the evidence *821 in the case that the risk was unreasonable.
We'll talk about the concept of accident. The Defendant contends that he did not act with criminally reckless conduct but rather, that what happened was an accident. If the Defendant did not act with criminally reckless conduct required for a crime, the Defendant is not guilty of that crime.
The court then discussed the third and final element of the first-degree offense and concluded by instructing the jury to
make every reasonable effort to agree unanimously on the charge of first degree reckless homicide before considering second degree reckless homicide. However, if after full and complete consideration of the evidence you conclude that further deliberation would not result in unanimous agreement on the charge of first degree reckless homicide, you should consider whether the Defendant is guilty of second degree reckless homicide.
*432 2. Second-degree reckless homicide, use of a dangerous weapon
¶25 After defining second-degree reckless homicide per Wis. Stat. § 940.06, the court explained the difference between first-degree and second-degree reckless homicide-that "the first degree offense requires proof of one additional element; namely, that the circumstances of the Defendant's conduct showed utter disregard for human life"-and told the jury:
If you are satisfied beyond a reasonable doubt that all the elements of first degree reckless homicide were present except [the additional element], you should find the Defendant guilty of second degree reckless homicide.
The circuit court did not repeat the instructions for self-defense or accident. It then concluded:
However, if after a full and complete consideration of the evidence you conclude that further deliberation would not result in unanimous agreement on the charge of second degree reckless homicide, then you should consider whether the Defendant is guilty of homicide by negligent handling of a dangerous weapon.
3. Homicide by negligent handling of a dangerous weapon
¶26 After defining homicide by negligent handling of a dangerous weapon per Wis. Stat. § 940.08(1), the circuit court again discussed self-defense:
Self defense is an issue in this case that also applies to the charge of homicide by negligent handling of a dangerous weapon. In deciding whether the Defendant's conduct was criminally negligent conduct, you should also consider whether the Defendant acted lawfully in self defense.
*433 As I previously indicated, the law of self defense allows the Defendant to threaten or intentionally use force against another only if the Defendant believed that there was an actual or [imminent] unlawful interference with the Defendant's person and the Defendant believed that the amount of force the Defendant used or threatened to use was necessary to prevent or terminate the interference and the Defendant's beliefs were reasonable.
The Defendant may intentionally use force which is intended or likely to cause death or great bodily harm only if the Defendant reasonably believed that the force [ ] used was necessary to prevent [imminent] death or great bodily harm to himself.
And as I previously indicated, a belief may be reasonable even though *822 mistaken. In determining whether the Defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the Defendant's position under the circumstances that existed at the time of the alleged offense.
The reasonableness of the Defendant's beliefs must be determined from the standpoint of the Defendant at the time of the Defendant's acts and not from the viewpoint of the jury now.
The court then reiterated its prior instruction on retreat:
And as I previously indicated, there's no duty to retreat. However, in determining ... whether the Defendant reasonably believed that the amount of force used was necessary to prevent or terminate the interference, you may consider whether the Defendant had the opportunity to retreat with safety, whether such retreat was feasible and whether the Defendant knew of the opportunity to retreat.
*434 And, after reciting the definition of "criminal negligence"-that "Defendant's operation or handling of a dangerous weapon created a risk of death or great bodily harm and the risk of death or great bodily harm was unreasonable and substantial [of which] the Defendant should have been aware"-the court again discussed the defense of accident:
Once again, the Defendant contends that he was not aware of the risk of death or great bodily harm required for a crime but rather that what happened was an accident.
If the Defendant was not aware of the risk of death or great bodily harm required for a crime, the Defendant is not guilty of that crime. Before you may find the Defendant guilty of homicide by negligent operation of a dangerous weapon ... the State must prove by evidence that satisfies you beyond a reasonable doubt that the Defendant should have been aware of the risk of death or great bodily harm.
4. General instructions
¶27 In addition to these charge-specific instructions, the circuit court generally instructed the jury, in relevant part, as follows:
Defendants are not required to prove their innocence. The law presumes every person charged with the commission of an offense to be innocent. This presumption requires a finding of not guilty unless in your deliberations you find it is overcome by evidence which satisfies you beyond a reasonable doubt that the Defendant is guilty.
The burden of establishing every fact necessary to constitute guilt is upon the State. Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the Defendant is guilty.
*435 ¶28 Defense counsel did not object to either the charge-specific instructions or the general instructions.
C. Postconviction Motions
¶29 On July 17, 2015, the jury returned its verdict: "We, the jury, find the defendant, Joseph Langlois, guilty of Homicide by Negligent Handling of a Dangerous Weapon." Langlois moved for a judgment notwithstanding the verdict, which the circuit court denied. On September 28, 2015, the circuit court entered judgment of conviction[18] and sentenced Langlois to five years probation.
*823 ¶30 Langlois filed his first postconviction motion on September 9, 2015, pursuant to Wis. Stat. § 974.02, moving for reconsideration of the denial of his motion for judgment notwithstanding the verdict. He argued that there was insufficient evidence to support the verdict because the State failed to prove beyond a reasonable doubt that "a normally prudent person under the same circumstances" "should have been aware that his operation or handling of a dangerous weapon created the unreasonable and substantial risk of death or great bodily harm."[19] Relatedly, Langlois challenged the jury instructions, focusing on the accident instruction:
The instructions on accident should have directed the jury to consider whether the State proved by evidence *436 beyond a reasonable doubt that the defendant should have been aware of the "unreasonable and substantial" risk of death or great bodily harm; not merely the "risk" of death or great bodily harm. This omitted language created a lower standard for the State to meet in order for the jury to find the defendant guilty of Homicide by Negligent Handling of a Dangerous Weapon.
On October 7, 2015, the State responded that the only element in dispute was whether Langlois acted with criminal negligence, and there was sufficient evidence to support the verdict because both his written statement and videotaped confession "show that a jury could have drawn the appropriate inferences." The State also pointed out that Langlois' argument regarding the jury instructions was waived by defense counsel's failure to object,[20] but argued that, in any event, "the jury instructions as a whole did not mislead the jury." The circuit court denied Langlois' motion by decision and order dated October 29, 2015, concluding that "[t]he undisputed evidence ... was more than *437 sufficient to allow the jury to conclude beyond a reasonable doubt that Langlois was criminally negligent," and that "there is not even a hint of any possible error in the instructions."
¶31 Langlois filed his second postconviction motion on May 2, 2016, pursuant to Wis. Stat. § 809.30(2)(h), renewing his arguments regarding the sufficiency of the evidence and the jury instruction on accident, but now also challenging the jury instruction on self-defense and raising a claim of ineffective assistance of counsel. He argued that the circuit court's failure to reiterate the State's burden to disprove *824 self-defense when it instructed on homicide by negligent handling of a dangerous weapon had the effect of shifting the burden to him. The State's response, filed June 1, 2016, repeated its arguments in response to Langlois' first postconviction motion: the jury instructions as a whole were complete and did not mislead the jury; therefore, failure to object was not ineffective assistance of counsel, there was no due process violation, and the real controversy was tried. Similarly, the State again pointed to Langlois' written statement and verbal interview as providing sufficient evidence to support the only disputed element-criminally negligent operation of a dangerous weapon. The circuit court denied this second motion by decision and order dated June 28, 2016, for the same reasons it denied Langlois' first motion: it concluded that the jury instructions were not erroneous[21] and that the evidence was sufficient.
¶32 On July 14, 2016, Langlois noticed appeal. The court of appeals affirmed.
*438 Langlois, 377 Wis. 2d 302, ¶¶1, 51, 901 N.W.2d 768. It concluded that the circuit "court's instructions to the jury, when viewed in their entirety and not in isolation, were not erroneous." Id., ¶36. With regard to the self-defense instruction, the court of appeals held that the jury had no reason to infer that Langlois bore any burden because the circuit court gave an accurate self-defense instruction, told the jury that self-defense applied to all of the counts, and specifically referenced the self-defense instruction when instructing the jury on negligent homicide by handling of a dangerous weapon. Id., ¶¶30, 32. With regard to the accident instruction, the court of appeals held that the instructions were clear as to the requisite mental state because they referred the jury back to the immediately preceding definition of criminal negligence. Id., ¶35. The court of appeals therefore concluded that trial counsel was not ineffective because failure to object to correct jury instructions is not deficient performance, and that Langlois was not entitled to a new trial in the interest of justice because there is no denial of due process where correct jury instructions are given. Id., ¶¶36-37. The court of appeals further concluded that the evidence was sufficient to support the verdict because a rational jury could have found that the knife was a dangerous weapon; that the way Langlois handled the weapon constituted criminal negligence; and that Langlois had not acted in self-defense because he had had the opportunity to leave the room without using force.[22] Id., ¶¶48-49, 51.
*439 ¶33 On August 11, 2017, Langlois petitioned for review. On December 13, 2017, we granted Langlois' petition for review.
II. STANDARD OF REVIEW
¶34 We consider first whether the jury instructions were erroneous. "A circuit court ... has broad discretion in instructing a jury. A circuit court appropriately *825 exercises its discretion in administering a jury instruction so long as the instructions as a whole correctly stat[e] the law and compor[t] with the facts of the case." Weborg v. Jenny, 2012 WI 67, ¶42, 341 Wis. 2d 668, 816 N.W.2d 191 (citation omitted). Whether a jury instruction correctly states the law is a question of law that we review de novo. Id.
¶35 We consider second whether there is sufficient evidence to sustain the conviction. This too is a question of law that we review de novo, and we will "not overturn a jury's verdict unless the evidence, viewed most favorably to sustaining the conviction, 'is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.' " State v. Beamon, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681 (quoting State v. Poellinger, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990) ).
*440 III. ANALYSIS
¶36 On review, we consider two issues. First, we consider whether the jury instructions were erroneous. We conclude that they were not, because, taken as a whole, they accurately state the law. Consequently, we conclude that there is no basis for Langlois' claim of ineffective assistance of counsel, there is no due process violation, and reversal in the interest of justice is not appropriate. Second, we consider whether there was sufficient evidence to support the jury's verdict. We conclude that there was, because the evidence, viewed most favorably to sustaining the conviction, supports a finding of guilt beyond a reasonable doubt.
A. Whether The Jury Instructions Were Erroneous
¶37 We consider first whether the jury instructions were erroneous. Langlois argues that the accident and self-defense instructions given for homicide by negligent handling of a dangerous weapon were erroneous. He argues that the instruction for accident was erroneous because it misstated the State's burden to prove his mental state when it omitted "unreasonable and substantial" before "risk." Similarly, Langlois argues that the instruction for self-defense was erroneous because it omitted the State's burden to disprove self-defense, thereby shifting the burden to him. The State argues that the jury instructions were not erroneous. It argues that the instruction for accident was not erroneous because, when viewed as a whole, the jury instructions established that the State had to prove Langlois was aware of a risk that was unreasonable and substantial. Moreover, because accident is a negative defense, the State disproves accident if it *441 proves all of the elements of the crime-which Langlois does not dispute were properly recited-beyond a reasonable doubt. Similarly, the instruction for self-defense was not erroneous because, when viewed as a whole, the jury instructions informed the jury that the State had the burden of disproving self-defense. Moreover, a review of the record reveals that Langlois was not entitled to instruction on self-defense. We conclude that the jury instructions were not erroneous because, taken as a whole, they accurately state the law.
1. Error
¶38 In determining whether a jury instruction correctly states the law, "[w]e review the jury instructions as a whole to determine whether the overall meaning communicated by the instructions was a correct statement of the law." Dakter v. Cavallino, 2015 WI 67, ¶32, 363 Wis. 2d 738, 866 N.W.2d 656 ; see also State v. Hubbard, 2008 WI 92, ¶27, 313 Wis. 2d 1, 752 N.W.2d 839 ("Jury instructions are not *826 to be judged in artificial isolation, but must be viewed in the context of the overall charge.").
a. Accident
¶39 The jury instruction for accident was not erroneous. The circuit court gave the accident instruction for homicide by negligent handling of a dangerous weapon immediately after defining "criminal negligence":
Criminal negligence means the Defendant's operation of handling of a dangerous weapon created a risk *442 of death or great bodily harm and the risk of death or great bodily harm was unreasonable and substantial and the Defendant should have been aware that this operation or handling of a dangerous weapon created an unreasonable and substantial risk of death or great bodily harm.
Once again, the Defendant contends that he was not aware of the risk of death or great bodily harm required for a crime but rather that what happened was an accident.
¶40 Langlois argues that it was error for the circuit court to omit "unreasonable and substantial" before "risk" in the second paragraph-the accident instruction-because it had the effect of lowering the State's burden to prove Langlois' mental state from "awareness of an unreasonable and substantial risk" to simply "awareness of a risk." This argument fails. " 'The' is a definite article used as a function word to indicate that a following noun or noun equivalent refers to someone or something that is unique." State v. Arberry, 2018 WI 7, ¶19, 379 Wis. 2d 254, 905 N.W.2d 832. Thus, the use of "the" before "risk" means that the instruction "contemplates only one unique, specified [risk]." Id.
¶41 Common sense compels the conclusion that the "one unique, specified risk" is the "unreasonable and substantial risk" discussed in the immediately preceding sentence. Accord Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 144 (2012) (noting that "legalistic pronoun[s]" such as "the risk" should be understood as referring to the nearest clarifying antecedent). This understanding is confirmed by the explanatory phrase that immediately follows this legalistic pronoun: "the risk of death or great bodily harm required for a crime." (Emphasis added.)
*443 ¶42 In sum, although the type of risk at issue might be less clear if the challenged accident instruction is read in isolation, the context provided by the immediately preceding sentence and the explanatory phrase that immediately follows clearly convey that "the risk" referenced in the accident instruction is "an unreasonable and substantial risk." Thus, the jury instruction given for accident on the charge of homicide by negligent handling of a dangerous weapon is not erroneous because, viewed in context, it communicates a correct statement of law.[23]
b. Self-defense
¶43 The jury instruction for self-defense was not erroneous. Although the initial self-defense instruction was given after the statutory definition for first-degree reckless homicide, the first paragraph made it clear that the instruction applied *827 generally to the case and specifically to criminally negligent conduct:
Self defense is an issue in this case. In deciding whether the Defendant's conduct was criminally reckless conduct which showed utter disregard for human life or was criminally negligent conduct, you should also consider whether the Defendant acted in lawful self defense.
*444 (Emphases added.) Therefore, the jury was aware that the initial instruction it was receiving applied to the case generally and to criminally negligent conduct specifically. Langlois does not dispute that this initial instruction was an accurate statement of the law; thus, the jury was properly instructed on self-defense.
¶44 Additionally, however, the circuit court reiterated the self-defense instruction after it gave the statutory definition of homicide by negligent handling of a weapon. Although it did not re-recite the State's burden of proof, it twice incorporated by reference its initial instruction on self-defense when it said, "As I previously indicated." Thus, the jury was reminded that the initial instruction, recited in the context of reckless homicide, applied equally to the context of negligent homicide.
¶45 Moreover, the circuit court gave the jury a general instruction on the State's burden to establish guilt beyond a reasonable doubt: "The burden of establishing every fact necessary to constitute guilt is upon the State. Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the Defendant is guilty." Because self-defense is a negative defense, the State disproves self-defense beyond a reasonable doubt if it proves the elements of the crime beyond a reasonable doubt, specifically criminal negligence. Therefore, the jury was aware that the State had to prove criminal negligence-the element that self-defense would negate-beyond a reasonable doubt.
¶46 Langlois argues, however, that the error is evident because the jury found him not guilty on the two counts where the self-defense instruction included the State's burden-first-and second-degree reckless homicide-but guilty on the count where the State's *445 burden was not reiterated-negligent homicide; he concludes, therefore, that the lack of reiteration of the State's burden is the reason that the jury found him guilty. This argument fails. As an initial matter, the circuit court did not repeat the accident or self-defense instructions for second-degree reckless homicide, but the jury still found Langlois not guilty of that offense. Additionally, inferring error from a verdict of guilt assumes that the evidence was otherwise insufficient to sustain the State's burden; but, as explained below, see infra ¶¶58-62, we conclude that the evidence was sufficient to find him guilty of negligent homicide by handling of a dangerous weapon beyond a reasonable doubt.
¶47 In sum, although the State's burden might be less clear if the challenged self-defense instruction is read in isolation, the context provided by the prior instruction and the general instructions clearly convey that the State bore the burden to disprove self-defense. Thus, the jury instruction given for self-defense on the charge of homicide by negligent handling of a dangerous weapon is not erroneous because, viewed in context, it communicates a correct statement of law.[24]
*828 2. Prejudice[25]
¶48 An erroneous jury instruction warrants reversal only when the error is prejudicial.
*446 Dakter, 363 Wis. 2d 738, ¶33, 866 N.W.2d 656. Langlois argues that the omissions in the jury instructions on accident and self-defense are reversible error on any one of three grounds: ineffective assistance of counsel, due process, or interest of justice. The State argues that, because the jury instructions were not erroneous, trial counsel did not render ineffective assistance by failing to object; there was no violation of Langlois' due process rights; and Langlois is not entitled to a new trial in the interest of justice. Because we conclude that the jury instructions were not erroneous, we also conclude that there is no basis for Langlois' claim of ineffective assistance of counsel, there is no due process violation, and reversal in the interest of justice is not appropriate.
a. Ineffective assistance of counsel
¶49 Whether trial counsel's failure to object to an error in the jury instructions constitutes ineffective assistance of counsel is a mixed question of law and fact. See State v. Breitzman, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.
The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial. If the defendant fails to satisfy either prong, we need not consider the other.
Id. (citations omitted). Whether trial counsel performed deficiently and whether any deficient performance *447 was prejudicial are questions of law we review de novo. Id., ¶¶38-39.
¶50 "[A] claim predicated on a failure to challenge a correct [jury instruction] cannot establish either" deficient performance or prejudice. State v. Ziebart, 2003 WI App 258, ¶14, 268 Wis. 2d 468, 673 N.W.2d 369 ; see also State v. Neumann, 2013 WI 58, ¶141, 348 Wis. 2d 455, 832 N.W.2d 560. Thus, because we conclude above that the jury instructions correctly stated the law, see supra ¶¶42, 47, we also conclude that there is no basis for Langlois' claim of ineffective assistance of counsel.
b. Due process violation
¶51 Whether an error in the jury instructions constitutes a violation of a party's due process rights is a question of law that we review de novo. See, e.g., State v. Badzinski, 2014 WI 6, ¶27, 352 Wis. 2d 329, 843 N.W.2d 29. "There are two types of jury instruction challenges: those challenging the legal accuracy of the instructions, and those alleging that a legally accurate instruction unconstitutionally misled the jury." State v. Burris, 2011 WI 32, ¶44, 333 Wis. 2d 87, 797 N.W.2d 430. Langlois appears to raise a challenge that incorporates both types because he claims that the omission of certain language (i.e., a legally inaccurate instruction) has misled the jury.
¶52 A jury instruction that incorrectly states the law violates due process if it has "the effect of relieving the *829 State of its burden of proving beyond a reasonable doubt every element of the offense *448 charged." State v. Harvey, 2002 WI 93, ¶23, 254 Wis. 2d 442, 647 N.W.2d 189. A jury instruction misleads the jury in a way that violates due process if "there is a reasonable likelihood that the instruction was applied in a manner that denied the defendant 'a meaningful opportunity for consideration by the jury of his defense.' " Burris, 333 Wis. 2d 87, ¶50, 797 N.W.2d 430 (quoting State v. Lohmeier, 205 Wis. 2d 183, 191, 556 N.W.2d 90 (1996) ).
¶53 Because we conclude above that the jury instructions correctly state the law, see supra ¶¶42, 47, we also conclude that there is no due process violation on the basis that legally inaccurate instructions effectively relieved the State of its burden of proof. Similarly, because we conclude below that there is sufficient evidence to sustain the conviction, see infra ¶¶58-62, we also conclude that there is no due process violation because there is no reasonable likelihood that the legally accurate instructions were applied in a manner that denied the defendant a meaningful opportunity for consideration by the jury of his defense. See State v. Ferguson, 2009 WI 50, ¶¶9, 45, 317 Wis. 2d 586, 767 N.W.2d 187 (citing Harvey, 254 Wis. 2d 442, ¶46, 647 N.W.2d 189 ) (noting that an instructional error is harmless if "it is clear beyond a reasonable doubt that a rational jury would have [nonetheless] found the defendant guilty").
c. Interest of justice
¶54 Whether an error in the jury instructions entitles a defendant to a new trial in the interest of justice requires us to consider Wis. Stat. §§ 752.35 and 751.06. Under Wis. Stat. § 752.35, the court of appeals *449 has discretion to reverse a conviction and order a new trial where "it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." § 752.35. "We review a discretionary determination for an erroneous exercise of discretion. The court [of appeals] erroneously exercises its discretion when it applies the wrong legal standard or makes a decision not reasonably supported by the facts of record." State v. Avery, 2013 WI 13, ¶23, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). Because we conclude above that the jury instructions correctly state the law, see supra ¶¶42, 47, and we conclude below that there is sufficient evidence to sustain the verdict, see infra ¶¶58-62, we also conclude that the court of appeals did not erroneously exercise its discretion in declining to reverse Langlois' conviction and order a new trial in the interest of justice.
¶55 Under Wis. Stat. § 751.06, we have independent discretionary authority to reverse a conviction and order a new trial where "it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." The interpretation and application of a statute present questions of law that we review de novo. Estate of Miller v. Storey, 2017 WI 99, ¶25, 378 Wis. 2d 358, 903 N.W.2d 759. In applying § 751.06, we exercise our discretion infrequently, judiciously, and only in exceptional cases. Avery, 345 Wis. 2d 407, ¶38, 826 N.W.2d 60. Because we conclude above that the jury instructions correctly state the law, see supra ¶¶42, 47, and we conclude below that there is sufficient evidence to sustain the verdict, see infra ¶¶58-62, we also conclude that this is not an exceptional case warranting *450 an exercise of our discretion to reverse Langlois' conviction and order a new trial in the interest of justice.
B. Whether There Was Sufficient Evidence
¶56 We consider second whether there was sufficient evidence to support *830 the jury's verdict. Langlois argues that there is insufficient evidence to sustain the conviction because the record establishes that he was acting in self-defense; thus, although his conduct created a risk, it was not an unreasonable one, and a properly instructed jury could not have found beyond a reasonable doubt that Langlois operated or handled a dangerous weapon in a manner constituting criminal negligence. The State argues that there is sufficient evidence to sustain the conviction because the record establishes that a rational jury could have found that the State proved each element of homicide by negligent handling of a dangerous weapon beyond a reasonable doubt. We conclude that there was sufficient evidence to sustain the conviction because the evidence, viewed most favorably to sustaining the conviction, supports a finding of guilt beyond a reasonable doubt.
¶57 The jury found Langlois guilty of homicide by negligent handling of a dangerous weapon, contrary to Wis. Stat. § 940.08(1). Section 940.08(1) provides, in relevant part, that "whoever causes the death of another human being by the negligent operation or handling of a dangerous weapon ... is guilty of a Class G felony." In order to establish that Langlois was guilty of the crime of homicide by negligent handling of a dangerous weapon, the State had to prove three elements beyond a reasonable doubt:
1. The defendant operated or handled a dangerous weapon.
*451 2. The defendant operated or handled a dangerous weapon in a manner constituting criminal negligence.
3. The defendant's operation or handling of a dangerous weapon in a manner constituting criminal negligence caused the death of [Jacob].
Wis JI-Criminal 1175, at 1 (2011).
¶58 As applicable here, "dangerous weapon" means "any device or instrumentality which, in the manner it is used or intended to be used, is likely to produce death or great bodily harm." Wis JI-Criminal 1175, at 1-2 (2011). At trial, Detective Wolf testified that the fillet knife had a six-inch long blade and Langlois testified that he knew the knife was sharp and that he held it with the point outward toward Jacob. This evidence is sufficient to establish *831 beyond a reasonable doubt that the fillet knife was a "dangerous weapon."
¶59 "Criminal negligence" means that (a) the defendant's operation or handling of a dangerous weapon created a risk of death or great bodily harm; (b) the risk of death or great bodily harm was unreasonable and substantial; and (c) the defendant should have been aware that his operation of a dangerous weapon created the unreasonable and substantial risk of death or great bodily harm. Wis JI-Criminal 1175, at 2 (2011). At trial, Langlois testified that he picked up the fillet knife, removed it from its sheath, and held it at his shoulder with the blade pointing outward. Langlois also testified that he had the opportunity to retreat but did not because he was "furious." Detective Clausing additionally testified that Langlois never used the word "accident" or "self-defense" in his statements and that he demonstrated a forward stabbing *452 motion during his reenactment of what happened. This evidence is sufficient to establish beyond a reasonable doubt that Langlois' handling of the fillet knife created a risk of death or great bodily harm that was unreasonable and substantial.
¶60 Furthermore, at trial, five of the seven character witnesses for the defense testified to Langlois' intelligence, describing him as a "smart, very smart, smart kid," "very intelligent," a "smart young man," "very smart," and "extremely smart." This evidence is sufficient to establish beyond a reasonable doubt that Langlois should have known that holding a six-inch fillet knife so that it was pointed outward toward another created an unreasonable and substantial risk of death or great bodily harm.
¶61 "Cause" means that "the defendant's act was a substantial factor in producing the death." Wis JI-Criminal 1175, at 1 (2011). At trial, Deputy Nauman, Investigator Klopfenstein, Detective Wolf, and Langlois all testified that there was a large amount of blood on the kitchen floor. Langlois further testified that he saw "the blood just squirting out of [Jacob] at a really high speed and really fast all in like one or two seconds." In addition, Dr. Okia testified that, to a reasonable degree of medical certainty, the cause of death was a puncture wound, six inches deep, on the left side of Jacob's chest between his second and third ribs. This evidence is sufficient to prove beyond a reasonable doubt that Langlois' act was a substantial factor in producing Jacob's death.
¶62 In sum, the evidence, viewed most favorably to sustaining the conviction, supports a finding of guilt beyond a reasonable doubt.
*453 IV. CONCLUSION
¶63 On review, we consider two issues. First, we consider whether the jury instructions were erroneous. We conclude that they were not, because, taken as a whole, they accurately state the law and did not mislead the jury. As a result, we also conclude that Langlois' counsel was not ineffective for failing to object to the jury instructions because it is not deficient performance to fail to object to jury instructions which are correct. We further conclude that there is no violation of Langlois' due process rights and that Langlois is not entitled to a new trial in the interest of justice because the jury instructions were not erroneous. Second, we consider whether there was sufficient evidence to support the jury's verdict. We conclude that there was, because a reasonable jury could have found guilt beyond a reasonable doubt.
By the Court. -The decision of the court of appeals is affirmed.

The Honorable James K. Muehlbauer presided.

All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

This recitation of the facts is based primarily on the testimony of Karen Langlois, the mother of both the victim and the defendant, who was an eyewitness to the altercation between her sons and testified for both the State and the defense at trial. Her testimony was largely corroborated by the testimony of the defendant, the only other eyewitness, and any factual disputes do not affect our analysis.

The record indicates that Jacob was packing both for a week-long trip up north with friends and for boot camp down south, which he would be leaving for right after his trip up north.

A fillet knife is a knife used to fillet a fish in the process of cleaning it.

All three remaining family members confirmed this.

The defense did not challenge the admission of any of Langlois' statements to the police.

On cross-examination, Klopfenstein agreed that there "was a lot of blood in that house," that Jacob "was hurt pretty significantly," and that was all "that was known to Karen."

The sheath and the knife were admitted into evidence as Exhibits 28 and 29, respectively.

A transcript of the interview was admitted into evidence as Exhibit 42.

At the close of the State's case-in-chief, Langlois moved to dismiss the charges. The circuit court denied the motion, concluding that "the case is sufficient to go to the jury and that there's enough evidence ... where the jury could decide, if it so chose, that the State has proven its case beyond a reasonable doubt."

Detective Clausing and Investigator Klopfenstein both confirmed that they met with Karen a second time during their testimony.

See Wis JI-Criminal 1022 (2015). This instruction is a combined instruction for first- and second-degree reckless homicide by use of a dangerous weapon for cases where, as here, second-degree reckless homicide is charged as a lesser-included offense of first-degree reckless homicide.

See Wis JI-Criminal 1175 (2011).

See Wis JI-Criminal 810 (2001).

See Wis JI-Criminal 801 (2014).

See Wis JI-Criminal 772 (2005).

The original judgment of conviction was entered on September 28, 2015. On November 24, 2015, an amended judgment of conviction was entered. This amended judgment reflected changes only to the conditions of probation to accommodate Langlois' employment.

In support of this motion, Langlois attached a screen shot of a text message received after the verdict by one of the jurors: "Hi Karen! I was one of the jurors on your son's case. He only received the guilty verdict because of a technicality in the law. It was the phrase 'should have known' 'could cause severe bodily harm or death'. That charge was one the da added." We agree with the circuit court that this "juror text message does not indicate any jury concern regarding sufficiency of the evidence." Rather,
[the juror's] statement that a "technicality in the law" required the jury to find [ ] Langlois guilty because he "should have known" that his handling of the knife created an unreasonable and substantial risk of death or great bodily harm clearly indicates that despite sympathy for [Karen], the jury understood and performed its sworn obligations correctly.

Langlois argued that, to the contrary, defense counsel had objected to instruction on lesser-included offenses in general-which is confirmed by the record-and that even where an argument is not preserved by objection, a court may "grant a new trial in the interest of justice when it is of the opinion that justice has been miscarried or a verdict is returned based upon erroneous instructions of law."

The circuit court did additionally find that, in retrospect, "there was no basis in the first instance for the court to have given a self-defense jury instruction."

Presiding Judge Reilly dissented. In his view, counsel was deficient for failing to object to the jury instructions for homicide by negligent handling of a dangerous weapon because they were incomplete, and this error was "clearly prejudic[ial]." State v. Langlois, 2017 WI App 44, ¶61, 377 Wis. 2d 302, 901 N.W.2d 768 (Reilly, P.J., dissenting). He would have held that, although the self-defense and accident instructions for first- and second-degree reckless homicide were complete and correct, the instructions for negligent homicide were incomplete, and the jury cannot rely on the instructions given for crimes that are not under consideration when reaching a verdict. Id., ¶¶52, 57, 60.

We recognize that the circuit court was reasonably concerned about the length of the jury instructions in this case. Although we conclude that the abbreviated jury instructions given in this case were not erroneous, it is best practice to read the pattern instructions for each charge, except, of course, where the pattern instructions themselves are abbreviated. See supra note 13. In fact, had the circuit court taken the time at trial and not abbreviated the instructions as it did, this issue would not have existed to appeal.

In so concluding, we agree with the court of appeals that Langlois' reliance on State v. Austin, 2013 WI App 96, 349 Wis. 2d 744, 836 N.W.2d 833, is misplaced because, in Austin, the circuit court made no mention at all of the State's burden to disprove self-defense. See Langlois, 377 Wis. 2d 302, ¶¶31-32, 901 N.W.2d 768.

Although we recognize that we need not address prejudice because we conclude that the jury instructions are not erroneous, we choose to fully address the prejudice argument raised for the sake of completeness.