# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3132

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANCHIE FARMER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 4:11-cr-40073-JPG-1—**J. Phil Gilbert**, *Judge.*

ARGUED APRIL 4, 2013—DECIDED MAY 30, 2013

Before MANION, TINDER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury convicted Franchie Farmer of armed bank robbery in violation of 18 U.S.C. §§ 2113(a), (d), and 2, as well as use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Several days after the trial, an alternate juror contacted Farmer's counsel and said that other jurors had made statements during the prosecution's case indicating that they had discussed the evidence

and had already decided Farmer was guilty, all before jury deliberations could have properly begun. Farmer moved for a new trial, arguing that this premature deliberation prejudiced her and violated her right to a fair trial. The district court denied the motion for a new trial and imposed a sentence of 141 months in prison.

Farmer appeals her conviction, arguing for the first time on appeal that the evidence was not sufficient to support a guilty verdict. She also renews her contention that she is entitled to a new trial based on the juror's information. We affirm. The evidence was sufficient to support a guilty verdict, and the district court did not abuse its discretion by denying the motion for a new trial.

I. *Sufficiency of the Evidence*

"An appellant who challenges the sufficiency of the evidence underlying his conviction must show that no reasonable jury could have found his guilt beyond a reasonable doubt." *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010), citing *Jackson v. Virginia*, 443 U.S. 307 (1979). If "any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt, then the conviction must be upheld." *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011); *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010). This standard is difficult to meet, though the difficulty depends directly on the strength of the government's evidence. *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013).

Farmer did not argue to the district court that the evidence was insufficient, so our review is only for plain error. *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). In this case, though, the difference between plain error review and the ordinarily applicable standard makes no difference. There was no error, for there was substantial evidence of Farmer's guilt.

We summarize the government's evidence and theory of the case in light of the deferential standard of review for sufficiency of the evidence. Two armed people robbed the Capaha Bank in Tamms, Illinois on November 6, 2008. The government's theory of the case was simple: Farmer helped plan the robbery, wrote the demand note given to a teller, and drove the two robbers to and from the bank. (Farmer brought with her a mentally disabled woman for whom she provided daily care.)

A bank customer testified that he escaped from the bank during the robbery, hid from view outside the bank, and saw the two robbers leave the bank and enter the backseat of a dark SUV. He also testified that he saw two people sitting in the front seat of the SUV. The police testified that they were able to identify these two armed people as Richard Anderson and Holli Wrice after Anderson's ex-girlfriend identified Anderson from surveillance tape that aired on the local news, and one of his fingerprints was found on the robbery demand note.

Police testified to the relevant aspects of their investigation: A few months into the investigation, police identified the getaway SUV as a black 2002 Toyota Sequoia

registered to Farmer. During a police interview, Farmer told police that she loaned her car and cell phone to Wrice in November 2008. Farmer also informed police that on the day in question she was working as a home care provider for a mentally disabled client. (The client was unable to testify.)

Police testified that after interviewing Farmer, they gathered cellular tower data on her cell phone. This data included a log of all outgoing and incoming calls, as well as the time and place of every call. An FBI agent testified that this analysis revealed inconsistencies between Farmer's story that she loaned her cell phone to Wrice and the cell phone data. The call logs showed dozens of calls between Wrice's and Farmer's cell phones before, during, and after the robbery. The FBI agent also testified that when Farmer was confronted with this anomaly, she could not provide any explanation. Finally, the FBI agent testified that the cell phone data showed that Farmer's cell phone traveled the route of the bank robbery on the date and time in question.

Wrice and Anderson also testified at trial pursuant to plea agreements that required them to cooperate and testify truthfully. Wrice testified that she and Farmer had discussed committing the bank robbery for some time before November 2008. Both Wrice and Anderson testified that Farmer drove them, along with her disabled client, to the bank and that they returned to Farmer's car after the robbery. She then dropped the two off at her house before returning with her client to the client's home. Wrice and Anderson also both testified that

earlier that day, they saw Farmer write the demand note they later presented to the teller during the robbery. A handwriting analyst testified that the handwriting on the demand note shared a number of characteristics with a sample of Farmer's handwriting, but the analyst could not exclude the possibility that someone else had written the note.

Viewing all this evidence, as we must, in the light reasonably most favorable to the government, there was ample evidence to find Farmer guilty on the government's theory that she had planned and orchestrated the robbery. In fact, Farmer does not actually argue that the evidence presented at trial was insufficient, if believed, to support each element of the crimes beyond a reasonable doubt. She instead challenges the credibility of the government's witnesses, arguing that their testimony was contradictory and unreliable and should not have been believed. Credibility challenges face an even higher hurdle than claims that the totality of the evidence is insufficient to support the conviction. *United States v. Carraway*, 612 F.3d 642, 645 (7th Cir. 2010) ("As if the bar for sufficiency-of-evidence challenges were not high enough, Carraway's argument takes a particularly difficult route by effectively conceding that he cannot win unless we were to find that Owens, the primary witness linking him to the crack, was not credible.").

When considering a challenge to the credibility of a witness' testimony, "[w]e will overturn a conviction based on a credibility determination only if the witness' testimony was incredible as a matter of law." *Id.* (internal

citation omitted); see also *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001) ("The lack of a complete overlap between the recollection of two witnesses is hardly surprising, and it was the province of the jury to determine whether those inconsistencies rendered the testimony incredible."). Given our duty not to invade the province of the jury, to find a witness' testimony incredible as a matter of law, it must "have been physically impossible for the witness to observe what he described, or . . . impossible under the laws of nature for those events to have occurred at all." *Id.* (internal quotations omitted). As our summary of the trial evidence shows, any challenge to Wrice's or Anderson's credibility as well as to any inconsistencies between their testimonies cannot meet this high burden. Farmer's challenge to the testimony falls far short of this standard.

Farmer also challenges specific pieces of evidence, namely the cell phone data and the handwriting analysis, in isolation, as insufficient to sustain her conviction. This argument is misguided. The law does not require that each piece of evidence exclude beyond a reasonable doubt the possibility of innocence. The totality of the evidence, taken together as a whole, must do so. We will overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010). The jury's duty was to consider the entire record as presented at trial; it was not required to consider whether or not one piece of evidence

in isolation supported a guilty verdict. For these reasons, Farmer's challenges to the sufficiency of the cell phone data and handwriting evidence fail.

Farmer's last challenge, that Wrice had the motive and opportunity to frame her, is an argument for the jury at trial, not for us on appeal. We do not reweigh the evidence or make our own credibility determinations. "The inquiry does not ask what we would have decided if we were on the jury. We need not be convinced by the evidence ourselves." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013). We need only ensure that a rational jury could, based on the record presented, rationally find guilt beyond a reasonable doubt on each element of the charged crimes. The jury here could do so.

II. *Motion for a New Trial*

The jury convicted Farmer after three days of testimony. Farmer then moved for a new trial alleging juror misconduct. She submitted an affidavit from an alternate juror. (At oral argument, counsel made it clear that the juror, acting on his own, located counsel to share the information in the affidavit.) The affidavit said that before the prosecution had finished presenting its evidence, one juror said, "I wrote my verdict down right away and it hasn't changed yet." In conversation with others, a second juror said, "Yeah, like if 11 say guilty and 1 says not guilty. It's like 'come on!'" Before lunch on the second day of trial, a juror said, "Could we just go ahead and vote now so we can get out of here? Haha." The alternate juror overheard this comment but did not see

who made it. The alternate juror said: "This comment was made in the sense that many had already decided that the defendant was guilty."

The affidavit concluded: "There were numerous other comments made regarding the perceived guilt of the defendant during the trial. In my opinion, these comments made it clear that certain jurors wanted to be outspoken about their opinion of guilt before the jury was able to deliberate. These outspoken opinions made it clear that an opinion other than guilty was going to be met with disapproval." The district court denied the motion for a new trial for reasons that track closely our own thinking about the issue.

"We review a district court's handling of allegations of premature deliberations and juror bias for an abuse of discretion." *United States v. Morales*, 655 F.3d 608, 629 (7th Cir. 2011). The most basic axioms of our system of criminal law are that the defendant is presumed innocent and the prosecution always has the burden of proving guilt beyond a reasonable doubt. Ensuring that the defendant enjoys a presumption of innocence throughout the trial remains one of the most important duties of both trial and appellate judges. The jurors' reported comments here indicate that at least a few jurors did not follow the district judge's instructions about presuming the defendant was innocent, keeping an open mind, and waiting to the end of trial before deliberating.

At the same time, we are dealing with fallible human beings and institutions. It's a rare jury trial in which there are no mistakes on anyone's part. The Supreme

Court has warned that zealous attempts to achieve perfection in jury deliberations are likely to do more harm than good: "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it." *Tanner v. United States*, 483 U.S. 107, 120 (1987). Such a practice would threaten the finality of too many verdicts and invite losing parties to harass jurors, *id.* at 119-20, quoting *McDonald v. Pless*, 238 U.S. 264, 267-68 (1915), and close scrutiny of jury verdicts on the basis of alleged juror misconduct would also undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id.* at 120-21. To borrow an old adage, the jury system cannot afford to allow the perfect to become the enemy of the good.[1]

The Supreme Court's warning in *Tanner* reflects a well established common law prohibition on post-verdict inquiry into jury deliberations and the use of juror testimony to impeach a verdict. Federal Rule of Evidence

---

[1] Which is not to say that there is not room for improvement. See, *e.g.*, Robert C. Walters, et al., *Jury of Our Peers: An Unfulfilled Constitutional Promise,* 58 SMU L. Rev. 319 (2005) (discussing under-representation of minorities on juries and the ABA's model standards that attempt to mitigate this problem, and surveying different states' approaches to the problem).

606(b) codifies the "near-universal and firmly established common-law rule" that "flatly prohibited the admission of juror testimony to impeach a verdict." *Tanner*, 483 U.S. at 117. Rule 606(b) cabins post-verdict review of juror deliberation. In the event of "inquiry into the validity of a verdict or indictment," Rule 606(b)(1) bars juror testimony on, and court consideration of, the jury's internal deliberations, including the jurors' discussions and mental processes. The rule also prohibits the court from "receiv[ing] a juror's affidavit or evidence of a juror's statements on these matters." *Id.* To preserve the privacy and independence of juries from well-intentioned efforts to perfect them, such evidence is simply not admissible.[2]

Potentially prejudicial communications that occur before jury deliberations, however, are not wholly protected by Rule 606(b) and therefore may be considered by the district court in certain cases. See *United States v. Kimberlin*, 805 F.2d 210, 243-44 (7th Cir. 1986) (interpreting

---

[2] While courts may not consider any internal or intra-jury communications, they may consider the effect of improper external or extraneous influences on a jury. Rule 606(b)(2) creates exceptions to this broad rule if "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." See also *Tanner*, 483 U.S. at 117 (explaining the "external/internal distinction" used by courts "to identify those instances in which juror testimony impeaching a verdict would be admissible").

Rule 606(b) as not reaching "communications between jurors [that] were allegedly made during the course of trial"). In such cases, while a juror still may not testify to "the effect of the communication upon his mind or emotions, or concerning his mental processes in connection with the verdict," the district court may consider whether such statements should be presumed prejudicial. *Id.*; see also *United States v. Morales*, 655 F.3d 608, 631 (7th Cir. 2011) (explaining that "[a]ny inquiry as to bias arising from the alleged premature deliberations would run afoul" of Rule 606(b)). Cf. *United States v. Paneras*, 222 F.3d 406, 411 n.1 (7th Cir. 2000) ("In evaluating a claim that a jury was improperly influenced by extraneous material, a district court must ignore a juror's comment regarding how a particular piece of material disposed the juror toward a particular verdict, and the district court must make an independent determination of the likely effect of the prejudicial material.") (internal quotations omitted).

Thus, when a district court receives information after a verdict is returned that jurors engaged in premature deliberation or made pre-deliberation statements indicating they had already made up their minds, Rule 606(b) does not prevent consideration of evidence of the statements or conduct, but it does prevent consideration of evidence about whether and how such statements or conduct may have affected actual deliberations and verdicts. In essence, the court must ignore any evidence about the supposed actual effects of the statements or conduct on the jurors, and must rely instead on precedent, experience, and common

sense to gauge whether the statements or conduct should be *presumed* prejudicial.

Here, the district court determined that the statements should not be presumed prejudicial. That finding was not an abuse of discretion. See, *e.g.*, *Kimberlin*, 805 F.2d at 243-44 (finding no abuse of discretion in not presuming prejudice where defendant claimed that prior to deliberation, one juror had said, "'They ought to hang him now, so that we can go home,' or words to that effect"). The comments reported by the alternate juror were not appropriate but are also not unknown in experience with lay jurors encountering unfamiliar procedures and institutions, perhaps for the first time. It is virtually impossible for a human being serving as a juror not to form preliminary opinions about a case while the evidence is presented. Some jurors succumb to the temptation to share those preliminary opinions with others.

As we pointed out in *Morales*, some state court systems actually allow such discussions among all jurors during trial if the jurors are reminded not to make any final judgment until deliberations begin at the end of the trial. 655 F.3d at 632 n.8, citing Ind. Jury R. 20(a)(8), Ariz. R. Civ. P. 39(f), and Shari Seidman Diamond, et al., *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003). The federal system does not authorize such premature discussions among jurors, but the fact that they have occurred does not mean that the ultimate verdict must be set aside. We count on the court's final instructions to the jurors and the gravity of the group deliberations to rein in jurors

who may struggle with or even make light of their important responsibilities.

To argue for reversal, Farmer relies on *United States v. Vasquez-Ruiz*, 502 F.3d 700 (7th Cir. 2007). There a juror informed the judge during the trial that the word "GUILTY" had been written in her juror notebook by someone else, and neither the parties nor the judge could be confident that the communication had come from another juror. We reviewed the district court's intervening measures and determined that questioning the juror and a curative instruction were not sufficient to mitigate the potential prejudice. We ordered a new trial.

*Vasquez-Ruiz*, however, differs in two important respects from this case. First, in this case the information came to the attention of the court only after the verdict was returned, when no corrective action could be taken and any inquiry into the effects of the comments would have run into Rule 606(b)'s bar on such inquiry. Second, the information here did not indicate any external influence on the jury. The Supreme Court has instructed us always to remember the importance of finality when considering post-verdict requests to review potential juror misconduct: "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." *Tanner*, 483 U.S. at 120. And in *Vasquez-Ruiz*, the prospect that the message came from someone outside the jury gave rise to a presumption of prejudice. 502 F.3d at 705-06. There is no such prospect here. Given these differences, the district

court did not abuse its discretion by denying Farmer's motion for a new trial based on alleged juror misconduct.[3]

The judgment of the district court is AFFIRMED.

---

[3] The timing of the district court's discovery of potential juror misconduct is, of course, no fault of Farmer's counsel, who did not become aware of such alleged misconduct until the alternate juror located and contacted him after the verdict. If we were to find that the court abused its discretion in this circumstance, though, the finality of *any* jury verdict could be called into question any time a disgruntled juror made a telephone call after the trial. This is precisely the prospect the Supreme Court sought to avoid in *Tanner*.