In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2202

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANKUR ROY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 377-1 — **Gary Feinerman**, *Judge.*

ARGUED FEBRUARY 16, 2016—DECIDED APRIL 15, 2016

Before POSNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge*. The defendant was prosecuted for defrauding Medicare and Blue Cross Blue Shield by submitting claims for reimbursement for respiratory therapy that he (more precisely the company of which he was Chief Executive Officer) had not provided. He was convicted by a jury and sentenced to 75 months in prison to be followed by three years of supervised release, and also ordered to pay restitution to the victims of the fraud of some $2.5 million.

His principal claim on appeal is that his constitutional right to be tried by an impartial jury was violated, primarily because the district judge refused to order the jurors to return to court after the trial for a hearing about alleged juror misconduct or to order a new trial.

Three days after the jury rendered its guilty verdict one of the jurors had sent the court a three-page "report on jury misconduct." It was a follow-on to a phone call that he had made to the district court, in which he'd told a member of the court's staff that he wanted to retract his vote to convict. He had signed the jury verdict of guilty; had he not, the defendant would not have been convicted because the jury's verdict would not have been unanimous.

Though the juror's report deals mainly with the jury's deliberations, it opens by stating that "every single juror in the [jury] room, except for two, had already expressed a strong dislike of the defendant and his defense counsel—from the very first day" of the trial. According to the author of the report, he and another juror were the only jurors "who believed in starting deliberations with the presumption that the defendant was innocent." But the other juror was excused from jury duty after deliberations began, and replaced by an alternate.

In breaks in a federal jury trial, which are frequent, the jurors repair to a jury room, having been instructed by the judge that they're not to discuss the case until the trial ends and deliberations on the verdict begin. See, e.g., *United States v. Morales*, 655 F.3d 608, 629–32 (7th Cir. 2011). (Interestingly, some state courts are permitted to, and do, allow jurors to discuss the case before the end of the trial, the judge having instructed them, however, not to decide the case before then.

*United States v. Farmer*, 717 F.3d 559, 565 (7th Cir. 2013); Shari Seidman Diamond, et al., "Juror Discussions During Civil Trials: Studying an Arizona Innovation," 45 *Ariz. L. Rev.* 1 (2003).)

The jurors who allegedly expressed dislike for the defendant and his lawyer on the first day of the trial may have been intimating an intention of voting to convict, in which event they were "discussing" the merits of the case and the verdict they were likely to render, thus violating the judge's instructions. But they may instead have been expressing a personal antipathy unrelated to the question of the defendant's innocence or guilt, which though a violation of the judge's instructions might be thought harmless. The defendant is from India, and he speculates that the jurors' dislike of him was based on prejudice against dark-skinned people. But this conjecture is not supported by anything in the dissentient juror's lengthy report of the jury's alleged misconduct.

The bulk of the report is devoted not to the initial discussions in the jury room but instead to the jury's deliberations, which though as depicted in the report were abrupt, summary, and coarse are consistent with the jury's simply having found, in the course of their deliberations, the evidence of the defendant's guilt to be compelling. As the report we've been discussing was the work of a single juror, its accuracy could not be assessed without a full-scale hearing at which the other eleven jurors would be asked by the judge to explain their deliberations and justify their votes. But such a hearing is forbidden; Federal Rule of Evidence 606(b) prohibits evidence about jury deliberations unless there is an allegation that the jury was subjected to external influence,

*Tanner v. United States*, 483 U.S. 107, 121 (1987), and there is no such allegation in this case.

Quite apart from Rule 606(b), because the verdict was rendered more than 20 months ago the jurors' current recollections of their deliberations could not be trusted. Given this long remove from the trial, it's no surprise that the defendant is seeking not a hearing to determine whether there was jury misconduct but instead a brand new trial, a do-over on the ground that his original trial was indelibly tainted by the jury's premature discussion of the case—premature because the judge had instructed the jurors not to discuss the case until the trial was over and jury deliberations began.

The other complaint of the disgruntled juror is that another juror said he knew that the defendant, as the CEO of the company that had submitted the fraudulent claims on which the prosecution was based, was "by law … required to know where funds are coming from." Another juror agreed, on the basis of his own "experience in managing," and one or both of those jurors added "that it was illegal to withdraw ill-gotten funds." A third juror remarked "that in her professional experience with medical billing, there was no way he [defendant Roy] could not have known there was fraud in progress." The jurors may have been right or wrong, but there is nothing amiss in jurors' drawing on their everyday knowledge to help them form an opinion about the issues in the case, or, in what amounts to the same thing, on "the general body of experiences that jurors are understood to bring with them to the jury room." *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014).

A question raised by the juror's report is whether the jury engaged in premature deliberations, or even made a deci-

sion before discussion, as in the cry of the Queen of Hearts in the trial of the Knave of Hearts in *Alice in Wonderland*— "sentence first—verdict afterwards." Remember that the report states that all but two jurors (the complaining juror being one) expressed a strong dislike of the defendant from the first day of trial, and that he (that is, the author of the report) had without success on three occasions before deliberations began asked the other jurors to stop talking about the case. But this is just one juror's version of what happened, and for all we know the other jurors, if they remembered the first day of the trial at all, would deny having expressed dislike for the defendant and his lawyer.

We might have preferred the district judge to have summoned the jurors for a brief hearing a few days after the receipt of the dissentient juror's report, a hearing at which he could have asked each of them separately what if any discussion the jury had had before deliberations began. To order such a hearing would have been within the judge's authority. *United States v. Farmer*, *supra*, 717 F.3d at 565. But it would not be sensible to lay down a rule that any time a juror alleges jury misconduct the judge must order the jury to return for a hearing on the allegation. Such a rule would, when it became known, discourage persons from serving on juries (jury service is compulsory, but persons with a strong aversion to serving manage to avoid it by one means or another). At the same time such a rule would embolden disgruntled jurors to complain about the other jurors' behavior in the jury room. We can't do better than to leave it to the trial judge to decide whether alleged jury misconduct is likely to have affected the verdict in a case.

The judge discussed at length the defendant's challenge to the jury's verdict and concluded that a mistrial was unwarranted. His discussion is not entirely satisfactory. Notably he said that he had "regularly instructed the jurors not to speak among themselves or with others about the case during the trial," and "given this, the likelihood of prejudice from the jurors' pre-deliberation discussions is virtually nonexistent." That is an overstatement. If the dissentient juror was telling the truth, the jury *had* disobeyed the judge's instruction "not to speak among themselves … about the case during the trial." The likelihood of prejudice as a result of this disobedience could be considered "virtually nonexistent" only if jurors almost never disobey a judge's instructions, and we know that's not true. For example, Caren Myers Morrison, in her article "Can the Jury Trial Survive Google?" 25 *Criminal Justice* 4 (Winter 2011), presents evidence of jurors' defiance of trial judges' orders not to conduct Internet research on the case before them.

Yet the discussions among the jurors in this case in advance of deliberations may have concerned the defendant's likability rather than his guilt or innocence. The dissentient juror's report doesn't say that any juror had discussed his or her intended verdict before deliberations. Furthermore, the dissenting juror had, but failed to invoke, a foolproof remedy against the misconduct that he had observed: vote to acquit, thus hanging the jury and requiring that the case be retried before a different jury. Since it is likely the other jurors would have denied any impropriety had they been asked, this retrospective report is of little use to the judge; how would he have decided who was telling the truth?

This appeal and our resolution of it underscore the limitations of appellate review of trial-court decisions, limitations recognized in the numerous deferential standards of appellate review, such as clearly erroneous, arbitrary and capricious, abuse of discretion, and substantial evidence. These are not very illuminating terms, and there may be too many of them, but they are reminders of the practical limitations of appellate review. And although some problems discussed in this opinion would be easily solved were jurors' deliberations recorded and the recordings made available to judge and lawyers, that would inhibit the frank exchange of views among the jurors and by doing so weaken the jury system.

The unhappy truth, emphasized both in *United States v. Farmer*, *supra*, 717 F.3d at 564, and in other cases, notably the Supreme Court's decision in *Tanner v. United States*, *supra*, 483 U.S. at 120–21, is that, imperfect as our jury system undoubtedly is, see, e.g., Joel Cohen, "Helping Juries to Better Reach Untainted Verdicts," *HuffPost Crime*, Feb. 16, 2016, www.huffingtonpost.com/joel-cohen/helping-juries-to-better -_b_9237828.html (visited April 15, 2016), we are stuck with it. And so there is no satisfactory alternative to our standing back and according a large measure of deference to the trial judge's handling of the complaints of a juror concerning the jury's discussions before deliberations. Only the failure of the judge to take remedial measures (such as ordering a retrial) regarding palpable, egregious jury misconduct, or impermissible external influence on the jury, would justify our intervening, as we did in *United States v. Vasquez-Ruiz*, 502 F.3d 700 (7th Cir. 2007). This is not such a case.

So much for the alleged jury misconduct; Roy also challenges his sentence on different grounds sensibly rejected by the district judge. Roy objects to the application of a four-level enhancement under the Sentencing Guidelines for crimes involving more than 50 victims. U.S.S.G. § 2B1.1(b)(2)(B) (2011). Although the defendants used the Medicare numbers of 168 persons in their fraudulent billing scheme, Roy contends that they weren't victims because they suffered no monetary loss—that the only victims were Medicare and Blue Cross Blue Shield. But "victims" includes "any individual whose means of identification was used unlawfully or without authority," U.S.S.G. § 2B1.1 Application Note 4(E), and names and Medicare numbers are "means of identification," 18 U.S.C. § 1028(d)(7), making the individuals whose numbers were used victims.

The defendant also challenges the application to him of the two-level increase in his Guidelines offense level for abuse of a position of public or private trust. But the adjustment was appropriate because as CEO he exercised managerial discretion in determining how bills would be submitted to Medicare. See U.S.S.G. § 3B1.3, Application Note 1; *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000).

The judgment is

AFFIRMED.