COURT OF APPEALS
DECISION
DATED AND FILED

January 14, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2017AP2139-CR**

Cir. Ct. No. 2013CF725

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ALEJANDRO E. SILVA,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Alejandro Silva appeals a judgment of conviction, entered upon a jury verdict, for first-degree intentional homicide and an order

denying his postconviction motion, in which he sought a new trial based on an allegedly erroneous jury instruction and alleged juror misconduct. On appeal, Silva asserts that one of the jury instructions misstated the law regarding self-defense with respect to unintentional injuries to third parties, that the evidence was insufficient to convict him of the intentional homicide charge, and that the circuit court erroneously exercised its discretion by not ordering a retrial based on juror misconduct. Given these asserted errors, Silva also argues we should order a new trial in the interest of justice. We reject each of Silva's arguments and affirm.

## BACKGROUND

¶2 After a seven-day trial, a jury found Silva guilty of first-degree intentional homicide in the August 2013 shooting death of Kamewan Salzman outside of Benderz Bar in the Town of Oneida. The State's theory of the case was that Silva had fired four shots at Kamewan from a distance of about fifty feet following a bar fight involving Kamewan and his brother, Benno Salzman.[1] The bullet that struck Kamewan had ricocheted off the pavement before piercing his heart and killing him.

¶3 Benno testified that Silva and Silva's friend, Benjamin Evans, had been kicked out of Benderz Bar because they were not of legal drinking age. Silva and Evans were later seen handling a firearm outside the bar. Around bar closing, there was a physical fight that began outdoors behind the bar between two small groups, one of which included Benno and Kamewan and the other of which included Silva and Evans. The fight eventually migrated into the street near

_____

[1] We will use given names throughout this opinion where several individuals share the same surname.

2

Harley Bob's, a bar and grill across the street from Benderz Bar.[2] By that point, there were many spectators watching the fight, some of whom attempted to intervene to stop it.

¶4 One of the witnesses to the incident, Rhys Pocan, testified that Silva ran toward Harley Bob's, while Evans continued fighting. Benno pursued Silva and knocked him to the ground. Pocan's husband, Charles Little Bull, intervened and pulled Benno off of Silva. Silva got to his feet and attempted to hit Benno but missed and fell, and Benno then kicked Silva in the face.[3] Silva then stood up and urged Pocan and Little Bull to leave, and Benno walked away. Thereafter, according to Little Bull, "[a]ll of the fighting started to calm down." Other witnesses confirmed that the fight appeared over and that Silva had started to walk away from the area of the fight toward Harley Bob's. Benno and Kamewan had started to back away from the confrontation toward Benderz Bar.

¶5 Approximately five to ten seconds later, Little Bull heard gunshots. One witness recounted that when Silva was retreating, she saw Evans hand him a gun. Witnesses testified Silva racked the handgun slide to chamber a round, raised his right arm, and fired the weapon toward the group in front of Benderz Bar. At

---

[2] A residence near Harley Bob's recorded surveillance video of the fight and ensuing shooting, which video was played for the jury. Sergeant Matthew Krzoska, who viewed the video, testified that after the fight broke up, an individual he believed was Silva could be seen near Harley Bob's extending his right arm towards Benderz Bar in a "shooting motion." The video was of low quality, however, and there was some debate at trial about the ability of State witnesses to testify regarding what was depicted in the video or still photos obtained from it.

[3] Some of Pocan's testimony, as well as portions of the testimony of several other witnesses, was challenged by the State as being inconsistent with prior statements that the witnesses had given police. Additionally, the State introduced evidence that cast doubt upon the extent to which Silva was beaten during the fight, including by introducing testimony that Silva had told police all his injuries occurred while he was running through the woods after the shooting.

the time, no one appeared to be advancing or throwing objects toward Silva or Evans. Benno testified he saw Silva appear to aim the gun at Kamewan. Edward Skippergosh, who was watching the fight from the residence above Benderz Bar, saw Silva point the gun straight out from his body.[4] Pocan testified she saw sparks from bullets hitting the ground near her. Afterward, Silva was seen fleeing with the gun. He eventually returned to the scene and asked to be placed in a police car. As part of his subsequent discussions with police, Silva told them that he was not afraid of anyone.

¶6 Silva's defense presentation included expert witness Edward Hueske, who testified regarding his conclusion that the bullet that killed Kamewan had ricocheted off the ground. One of Silva's friends, Gerald Diamond, testified he saw Silva pull back the gun slide, point the gun at the ground in front of him toward the center of the road where the fight had occurred, and then fire the gun.

¶7 Silva also testified, explaining that he had asked Evans to bring the gun to Benderz Bar and to "take care of me if anything happens." Silva testified that Benno started the fight with him behind the bar. Silva wound up on the ground and attempted to run toward the front of Benderz Bar, where Kamewan and Benno pulled him back into the fight. After another few minutes of being hit, Silva attempted to run away across the street. He testified that he was followed by

---

[4] One witness at trial denied seeing Silva fire the gun, but an officer testified that when that witness was interviewed the morning after the incident, she had told police that she saw Silva point the gun "right at Kamewan," that the gun went off directly above her head, and that she had a loud ringing in her ears from the discharge. She had also told police that, just prior to the shooting, Silva had offered to give her a ride out of the area because she was "not going to want to be here after this."

three or four people and was pushed down from behind while he was near the front of Harley Bob's.

¶8      Silva testified that the fight eventually broke up and he retreated toward Harley Bob's, where he saw Evans near the truck in which they had driven to the bar. Silva testified he planned to "grab his pistol from [Evans] and walk home." He stated he did not take the gun from Evans with the intent to use it, but he wanted to have it with him for protection. Silva conceded that the fight was over by the time he was handed the gun.

¶9      Silva further testified that after taking the gun from Evans, he saw approximately three people coming toward him, including Benno. Kamewan was not among these individuals; Silva did not know where Kamewan was at the time he fired the shots. Silva testified he "decided to fire warning shots at these people" when they were between twenty and twenty-five feet away. Silva chambered a round and fired four shots in the direction of the people coming toward him. Silva testified he fired at the ground about ten feet in front of him to "kind of ward them away from me." Silva stopped shooting when the gun jammed, and then he ran into the woods. He testified he did not intend to hurt anyone when he fired the shots, and he did not fire them at anyone in particular.

¶10      After the evidentiary portion of the trial, the circuit court conducted a jury instruction conference outside the jury's presence. The parties agreed that, in addition to the first-degree intentional homicide instruction, the jury should be provided with jury instructions regarding the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide. The parties also agreed that the triggering mechanism for those lesser-included offenses was Silva's self-defense claim. As a result, the parties agreed that the court should

give WIS JI—CRIMINAL 1016 (2015), which sets forth how the jury is to consider self-defense in the context of determining whether to convict a defendant of any of the lesser-included offenses.

¶11    The circuit court then discussed two additional instructions it was considering to give relative to Silva's self-defense claims. First, the court stated it had discovered a withdrawn instruction, WIS JI—CRIMINAL 821, which discussed the privilege of self-defense as to first-degree intentional homicide under circumstances where the force used by the defendant causes unintended harm to a third party.[5] The court stated it was attempting to gather further information as to why instruction 821 was withdrawn, and it also suggested that WIS JI—CRIMINAL 820 was appropriate.[6] Instruction 820 explains the privilege of self-defense as to reckless conduct that injures a third party. The instruction, as modified for use in this case, stated that the jury was to consider the law of self-defense in deciding whether Silva's conduct as to Kamewan was criminally reckless conduct that showed utter disregard for human life. The instruction also advised the jury, however, that Silva "does not have a privilege of self-defense as to Kamewan Salzman if he was defending against actions of Benno Salzman." The 820 instruction was given to the jury over Silva's objection.

---

[5] At the time of the trial, WIS JI—CRIMINAL 821 had been withdrawn and was being revised. The Wisconsin Criminal Jury Instruction Committee subsequently approved the revised instruction in 2017. The jury was not ultimately given any version of WIS JI—CRIMINAL 821. The absence of the 821 instruction is not directly challenged on appeal, nor does the record reflect that Silva requested that instruction before the circuit court.

[6] It is unclear what version of WIS JI—CRIMINAL 820 was given. The copy in the record is undated, and the instruction was revised in 2018.

¶12    After the closing arguments, two of the fourteen jurors were randomly selected as alternates, and the remaining twelve jurors began deliberations on Thursday, July 16, 2015.   During deliberations, the jurors requested the circuit court to clarify whether "intent to kill" for purposes of first-degree intentional homicide related only to Kamewan or to other persons in the area.   After the court provided further instruction consistent with WIS JI—CRIMINAL 1016, the jury concluded its deliberations on Thursday and returned a guilty verdict for first-degree intentional homicide.  The jury was polled, and each juror confirmed that the verdict was unanimous.

¶13    The day after the trial concluded, defense counsel notified the circuit court that it had spoken with one of the alternate jurors, who had alleged there was juror misconduct during the trial.  Based on defense counsel's letter, the court ordered the alternate juror, Jane,[7] to give in-camera testimony at two hearings. Jane testified that the foreperson and three other jurors had, primarily on the penultimate day of the trial, discussed whom they thought should serve as alternate jurors based upon their perception that Jane and others were sympathetic to Silva.[8]  Jane testified that the foreperson was concerned about missing a trip to Washington, D.C., if deliberations were not concluded quickly, and two other jurors also had trips scheduled.

---

[7] Although the jurors in this case were not anonymous, the circuit court required the alternate juror (who was identified by name) to give in-camera testimony.  Out of an abundance of caution, we will use a pseudonym for the alternate juror.

[8] The belief amongst some of the jurors was apparently that the prosecution and the defense would each get to select one juror to serve as an alternate.  Jane admitted she had no information to suggest that any of the four jurors she identified had any role in the selection of the two alternate jurors.

¶14    Additionally, Jane testified that on the final day of trial, before Silva had concluded his testimony, the foreperson told the other jurors, "[W]e can start deliberations now because we already know how this case is going to go," although the foreperson did not state how she planned to vote. Jane testified that she and some other jurors responded, "[L]et's not talk about it." Jane acknowledged she did not have any interaction with any of the other jurors after she was selected as an alternate. Nonetheless, Jane testified that her opinion was that Silva should not have been convicted of first-degree intentional homicide and that "the jurors were in too much of a hurry to get on with their vacations and whatnots to actually sit down and look at the whole case in its entirety."

¶15    In June 2017, Silva filed a postconviction motion seeking a new trial, asserting that the 820 instruction misstated the law and misled the jury, and that there was prejudicial juror misconduct. The circuit court concluded instruction 820 was consistent with the law of self-defense as it relates to first-degree reckless homicide and was not misleading. In the alternative, it determined that any error in that instruction was harmless, as the jury was told only to consider first-degree reckless homicide if it did not find Silva guilty of first-degree intentional homicide. The court also rejected Silva's juror misconduct argument, finding that the alternate juror's claims about the jury rushing to judgment were "vague and speculative," that the alleged misconduct was not presumptively prejudicial, and that any of the jurors' time constraints were not extraneous factors that would permit the jury's verdict to be impeached. Accordingly, the court denied Silva's motion. He now appeals the judgment of conviction and the denial of his postconviction motion.

**DISCUSSION**

*I. Accuracy of the Jury Instructions*

¶16 Silva first argues that the circuit court's decision to give WIS JI—CRIMINAL 820 was erroneous because the instruction shifted the burden of proof and violated Silva's due process rights. A circuit court has broad discretion in instructing a jury. ***State v. Langlois***, 2018 WI 73, ¶34, 382 Wis. 2d 414, 913 N.W.2d 812. We will uphold that exercise of discretion as long as the instruction as a whole correctly stated the law and comported with the facts of the case. ***Id.*** Whether an instruction correctly stated the law is a question of law that we review de novo. ***Id.***

¶17 In this case, the circuit court concluded Silva's colorable self-defense claim required further instruction regarding two lesser-included offenses of first-degree intentional homicide: second-degree intentional homicide and first-degree reckless homicide. Accordingly, all parties agreed that WIS JI—CRIMINAL 1016 was appropriate to give to the jury. That instruction defined self-defense and stated that if the jury was not satisfied that the defendant committed first-degree intentional homicide, it must then consider whether the defendant was guilty of one of the lesser-included crimes, as follows:

> As applied to this case, the effect of the law of self-defense is:
>
> - The defendant is not guilty of any homicide offense if the defendant reasonably believed that he was preventing or terminating an unlawful interference with his person, and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to himself.
>
> - The defendant is guilty of second degree intentional homicide if the defendant caused the death of Kamewan Salzman with the intent to kill and

actually believed the force used was necessary to prevent imminent death or great bodily harm to himself, but the belief or the amount of force used was unreasonable.

- The defendant is guilty of first degree intentional homicide if the defendant caused the death of Kamewan Salzman with the intent to kill and did not actually believe the force used was necessary to prevent imminent death or great bodily harm to himself.

- The defendant is guilty of first degree reckless homicide if the defendant caused the death of Kamewan Salzman by criminally reckless conduct and the circumstances of the conduct showed utter disregard for human life. You will be asked to consider the privilege of self-defense in deciding whether the elements of first degree reckless homicide are present.

Instruction 1016 then defined the elements of first-degree intentional homicide, second-degree intentional homicide, and first-degree reckless homicide, further instructing the jury that it should not reach any of the subsequent offenses in the sequence unless it concluded, after a full and complete consideration of the evidence, that further deliberation would not result in unanimous agreement on the crime under consideration.

¶18 The circuit court instructed the jury in accordance with instruction 1016, including by defining the elements of first-degree reckless homicide. Specifically, first-degree reckless homicide required the jury to conclude that: (1) Silva caused Kamewan's death; (2) the death occurred as a result of Silva's criminally reckless conduct, meaning conduct that created a risk of death or great bodily harm under circumstances where the risk of death or great bodily harm was unreasonable and Silva was aware that his conduct created the unreasonable and substantial risk of death or great bodily harm; and (3) the circumstances of Silva's conduct showed utter disregard for human life. *See* WIS. STAT. § 940.02(1)

(2017-18).[9]  As to the second and third elements, the jury was specifically told to consider the law of self-defense in deciding whether the State had proved those elements.[10]

¶19    The circuit court then provided the jury with the 820 instruction, which elaborated upon the foregoing principles to clarify the relevant law should the jury conclude that Silva was acting in self-defense toward a person other than Kamewan:

> I already explained your efforts you have to make on either the first option or the second option.  You should strictly follow the law and the Court's charge on that. … If there's a point you get to consideration of first degree reckless homicide, there's a distinguishing thing in the law that needs to be brought to your attention.  I am going to read you that instruction.  This only applies to first degree reckless homicide.  This instruction should not be considered in any way on first degree intentional or second degree intentional homicide.
>
> This relates to if the jury believes the facts show there was self-defense as to Benno Salzman, who is not the victim in this case.  Now, there is some evidence, if you choose to believe it, in this case that the defendant was acting in self-defense as to Benno Salzman.  The fact that the law may allow the defendant to use force in self-defense as to Benno Salzman or someone other than Kamewan Salzman does not necessarily mean that the causing of harm to Kamewan Salzman was lawful.
>
> You must consider the law of self-defense in deciding whether the defendant's conduct as to Kamewan Salzman was criminally reckless, which showed utter disregard for human life, but the defendant when considering first degree

_____

[9] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[10] The jury was instructed that if Silva was acting lawfully in self-defense, his conduct did not create an unreasonable risk to another.  The jury was also told to consider the law of self-defense in determining whether the circumstances showed utter disregard for human life.

> reckless homicide does not have a privilege of self-defense as to Kamewan Salzman if he was defending himself against actions of Benno Salzman.
>
> On the earlier instruction, 1016, if you find that he was acting in self-defense of Kamewan Salzman on this count, you can once again consider the original self-defense language and privilege. If you find that he was acting in self-defense of Benno Salzman, it does not apply to harm caused to Kamewan as to first degree reckless homicide.

¶20    The 820 instruction did not misstate the law. WISCONSIN STAT. § 939.48(1) establishes the self-defense privilege in Wisconsin, which absolves a person of criminal culpability for threatening or intentionally using force against another person for the purpose of preventing or terminating what the person reasonably believes to be unlawful interference with his or her person. Important to this case, subsec. (3) clarifies that the privilege of self-defense

> extends not only to the intentional infliction of harm upon a real or apparent wrongdoer, but also to the unintended infliction of harm upon a 3rd person, *except that if the unintended infliction of harm amounts to the crime of first-degree ... reckless homicide, ... the actor is liable for [that crime]*.

Sec. 939.48(3) (emphasis added). Consistent with subsec. (3), the jury instructions in this case advised the jury that it could consider self-defense in determining whether the elements of first-degree reckless homicide were present, unless it concluded that Silva was defending himself against Benno and not Kamewan.

¶21    Although Silva frames his challenge as one to the legal correctness of the 820 instruction, in truth his claim appears to be that the instruction misled the jury. "A circuit court can err in instructing the jury not only by misstating the law but also by stating the law in a manner likely to mislead the jury." *Smith v. Goshaw*, 2019 WI App 23, ¶14, 387 Wis. 2d 620, 928 N.W.2d 619 (citation

omitted). Whether the instructions, taken as a whole, were misleading is a question of law. *Id.*, ¶9.

¶22 Silva contends the 820 instruction as given "forbids extending the privilege of self-defense to unintended third parties, and relieves the State of its burden to prove the elements of the offense beyond a reasonable doubt." Critically, Silva fails to identify the offense of which he is speaking. Silva appears to argue he was categorically denied the benefit of the self-defense instructions, including, apparently, on the first- and second-degree intentional homicide offenses. Silva argues the jury's confusion was evidenced by its question regarding whether the "intent to kill" necessary for first-degree intentional homicide applied only to Kamewan or to other persons in the area.

¶23 Silva fails to recognize that the circuit court clearly admonished the jury that the 820 instruction "only applies to first degree reckless homicide. This instruction should not be considered in any way on first degree intentional or second degree intentional homicide." The purpose of the instruction was to clarify the applicability of self-defense as to the reckless homicide charge, depending upon the identity of the person the jury concluded Silva was defending himself against (if it indeed concluded that Silva acted in self-defense). We presume the jury follows the instructions given to it. *State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989). The jury's question does not demonstrate that it failed to follow this instruction, as it specifically inquired about transferred intent as it related to the crime of first-degree intentional homicide.

¶24 Additionally, the harmless error standard applies to any error in the jury instructions. *State v. Neumann*, 179 Wis. 2d 687, 703, 508 N.W.2d 54 (Ct. App. 1993). An error is harmless if there is no reasonable possibility that the

error contributed to the conviction. *Id.* Here, the jury was repeatedly instructed not to reach any of the lesser-included offenses unless it concluded, after a full and complete consideration of the evidence, that further deliberation would not result in unanimous agreement on first-degree intentional homicide. That instruction, considered in conjunction with the facts that Silva *was* convicted of first-degree intentional homicide and the jury was instructed to consider the 820 instruction only in conjunction with the lesser-included offense of first-degree reckless homicide, demonstrates Silva is not entitled to relief on his claim of an erroneous jury instruction.[11]

## II. Sufficiency of the Evidence

¶25    Next, Silva challenges the sufficiency of the evidence to support his conviction for first-degree intentional homicide. This presents a question of law, which we review de novo. *Langlois*, 382 Wis. 2d 414, ¶35. We will not overturn the jury's verdict unless, as a matter of law, no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *Id.* (citing *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681). If there is any possibility that the jury could have drawn the appropriate inferences from the trial evidence to find guilt, we may not overturn a verdict. *State v. Hughes*, 2011 WI App 87, ¶10,

---

[11] Silva argues the jury could have proceeded down the list of lesser-included offenses, and, lacking unanimity on those offenses, then have returned to the first-degree intentional homicide charge after having read WIS JI—CRIMINAL 820. While it is possible the jury could have done this, the notion that it actually happened is entirely speculative. Silva does not point to any instructions that would have allowed the jury to essentially "start over" once they had proceeded down the list of lesser-included offenses. The instructions that were given to the jury regarding the sequencing suggest, to the contrary, that the jury was to find Silva not guilty if it did not unanimously conclude he was guilty of first-degree reckless homicide—i.e., the last offense it was to consider. Again, we presume the jury follows the instructions given to it. *State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

334 Wis. 2d 445, 799 N.W.2d 504. We view the evidence in the light most favorable to the State and to the conviction. *Id.*

¶26 The jury was instructed that a conviction for first-degree intentional homicide requires the State to prove that the defendant caused the death of the victim and that the defendant acted with the intent to kill. *See* WIS. STAT. § 940.01. Silva notes it is undisputed that Kamewan was killed by a bullet that had ricocheted off of the pavement. Silva argues that this fact alone "should have precluded the State from establishing the intent element," as there was "physical, incontrovertible proof that Silva was not pointing the gun at the victim when it was fired."

¶27 Contrary to Silva's arguments, there was direct testimony from which the jury could reach the necessary inference regarding his intent, and the fact that the fatal bullet ricocheted off of the pavement between Silva and Kamewan does not eliminate Silva's intent as a matter of law. Silva testified that, prior to going to the bar, he had asked Evans to hold onto the firearm, be alert, and "just take care of me if anything happens." Silva stated he was angry and embarrassed at the time of the shooting because he had "just been beaten in front of a large crowd of people." Silva admitted that after the fight, he walked over to Evans and told Evans to give him the gun, which Evans did.

¶28 As described above, the State presented considerable eyewitness testimony that Silva was pointing the gun straight out from his body at or near the time of the shooting. Benno testified he saw Silva standing in front of Harley Bob's pointing the gun directly at Kamewan. Another witness claimed she could not remember seeing Silva fire the gun, but her testimony in that regard was effectively impeached with evidence of a prior statement in which she told police

she saw Silva point the gun "right at Kamewan." She also had told police Silva had made a statement to her that she was "not going to want to be here after this." It was undisputed that Silva only stopped firing the gun after it jammed. Finally, the State's rebuttal case featured police investigators who testified that Silva never told them that he was firing the gun as "warning shots" or to scare away people.

¶29 To be sure, Silva testified he did not take the weapon from Evans with the intent to use it, and he denied having formed the intent to kill anyone. But the jury is the sole arbiter of the credibility of witnesses, and it alone is charged with the duty of weighing the evidence. *See State v. Poellinger*, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990). The jury need not accept a defendant's self-serving testimony. *See State v. Richardson*, 44 Wis. 2d 75, 80-81, 170 N.W.2d 775 (1969).

¶30 The jury could reasonably conclude from the foregoing evidence that at the time of the shooting, Silva possessed the intent to kill. Importantly, Silva concedes that an inference of intent could be drawn from the evidence presented at trial. He argues, however, that any such inference is unreasonable as a matter of law, given the undisputed fact that Kamewan was killed by a ricocheted bullet. What is lacking in Silva's argument is any explanation of why a ricocheted bullet *must* mean that Silva lacked the intent to kill.

¶31 Silva's briefing portrays the claimed nexus between the ricocheted bullet and the absence of intent as a matter of physics and logic. We presume he means to argue that the ricocheted bullet is definitive proof that he was not aiming the gun directly at Kamewan when he fired it. Despite Silva's certainty, there is no evidentiary support for his assertion in this regard. Silva lauds his "world-class expert testimony," but he does not cite to *any* specific instance in which Hueske

testified as to his opinion that Silva could not have been aiming at Kamewan based upon the ricochet.[12]  In fact, Hueske testified that ricochets are "very unpredictable" and he had "no information about where the shot was actually fired, in what direction."  Hueske stated the bullet could have hit the pavement anywhere within the fifty-foot distance between Silva and Kamewan.  He repeatedly made clear he was not testifying with certainty about how the individuals were positioned or from what angle the bullet was fired, including his concession during cross-examination that "[t]his is just a very rough, ballpark thing to give an idea that it's within the realm of possibilities but not anymore than that."

¶32    Moreover, it was not necessary for the jury to conclude that Silva was aiming directly at Kamewan to convict him of first-degree intentional homicide.  The jury was instructed that "intent to kill" means that a defendant had the mental purpose to take the life of another being or was aware that his or her conduct was practically certain to cause the death of another human being.  *See* WIS. STAT. § 939.23(4).  The mere fact of a ricocheted bullet is not incompatible, as a matter of law, with the jury's finding that Silva had formed the intent to kill at the time of the shooting.

*III.  Juror Misconduct*

¶33    Silva argues the record establishes clear and convincing evidence of prejudicial juror misconduct requiring a retrial.  We presume the jury properly arrived at its verdict.  *See After Hour Welding, Inc. v. Laneil Mgmt. Co.*, 108

---

[12] Hueske's report shows he was asked only to "evaluate the likelihood that the fatal bullet was a ricochet rather than a direct shot."  By the time of trial, that issue had been conceded.

Wis. 2d 734, 737-38, 324 N.W.2d 686 (1982). "The methodology a circuit court must utilize to determine whether to overturn a verdict and grant a new trial because of juror misconduct is well established." *Castaneda v. Pederson*, 185 Wis. 2d 199, 208, 518 N.W.2d 246 (1994). Initially, the party seeking to impeach the verdict must demonstrate the juror's testimony as to the misconduct is admissible under WIS. STAT. § 906.06(2) by establishing that: (1) the juror's testimony concerns extraneous information rather than the jurors' deliberative processes; (2) the extraneous information was improperly brought to the jury's attention; and (3) the extraneous information was potentially prejudicial. *State v. Eison*, 194 Wis. 2d 160, 172, 533 N.W.2d 738 (1995). After the circuit court determines whether the party has satisfied § 906.06(2), it must determine whether one or more jurors engaged in the alleged conduct and whether the error was prejudicial. *Id.* at 172-73.

¶34 A motion for a new trial is directed to the discretion of the circuit court and will not be disturbed on appeal absent a showing that the court erroneously exercised that discretion. *After Hour Welding*, 108 Wis. 2d at 740. We will uphold a circuit court's discretionary decision as long as the court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789.

¶35 Here, the circuit court recognized that Silva's claim primarily involved pre-deliberation statements and discussion rather than external influence, and it thus relied on *United States v. Farmer*, 717 F.3d 559 (7th Cir. 2013), as setting forth the applicable analytical framework. In *Farmer*, an alternate juror alleged that certain jurors had engaged in pre-deliberation discussion about the case before the close of evidence, and that several jurors had made statements

18

suggesting they had already determined the defendant's guilt. *Id.* at 563. On appeal, the court recognized that potentially prejudicial communications that occur before a jury's deliberations are not wholly protected by statute and may be considered by the courts in certain cases. *Id.* at 565. Under those circumstances, the court must disregard any evidence about whether and how pre-deliberation statements affected actual deliberations and the verdicts. *Id.* Instead, it must exercise its discretion and rely on "precedent, experience, and common sense to gauge whether the statements or conduct should be *presumed* prejudicial." *Id.*; *see also United States v. Morales*, 655 F.3d 608, 630-31 (7th Cir. 2011) (noting distinction between claims of external jury influence and intra-jury communications).

¶36 Silva essentially argues the circuit court was wrong to follow *Farmer*'s lead. He argues the circuit court ignored *After Hour Welding*, in which a dissenting juror in a civil case filed a post-verdict affidavit representing that other jurors had used ethnic slurs and derogatory language with reference to one of the witnesses at trial. *After Hour Welding*, 108 Wis. 2d at 736. Our supreme court treated this claim as an allegation that jurors had been exposed to extraneous prejudicial information, and it faulted the circuit court for failing to hold a hearing to examine the complaining juror under oath. *Id.* at 742.

¶37 Here, of course, the circuit court twice examined the alternate juror that had alleged pre-deliberation misconduct by other jurors. In *After Hour Welding*, the circuit court was instructed to determine whether there was clear and convincing evidence the complained-of statements were made and then determine as a matter of law "the probable effect of them upon a hypothetical average jury." *Id.* at 742. To make this determination, the court was instructed to consider a nonexhausive list of seven "requirements": (1) that the statement was in fact

made; (2) specifically when it was made; (3) the circumstances under which it was made; (4) who made it; (5) which, if any, jurors were present; (6) whether jurors not present were informed of the statement; and (7) other relevant facts about the statement which will assist the court to assess the prospect of unfair prejudice. *Id.*

¶38 We view *Farmer* and *After Hour Welding* as generally articulating the same standard, albeit in slightly different ways.[13] Given the prohibition on the circuit court invading the jury's deliberations, both cases generally require the court to determine the likely prejudicial effect of the alleged misconduct on the jury. Despite Silva's criticisms of *Farmer*, we do not perceive the circuit court here to have applied an incorrect legal standard when determining whether the alleged misconduct should be presumptively prejudicial.

¶39 Silva also argues that, given the evidence, the circuit court had no choice but to find prejudice as a matter of law. The alternate juror, Jane, testified about three general areas of concern: (1) time pressures to arrive at a verdict due to travel plans; (2) suggestions that at least the foreperson had made up her mind prior to Silva completing his testimony; and (3) discussions of which jurors might be sympathetic to Silva, and therefore selected as alternates. We agree with the circuit court that these matters, either alone or in combination, were not

---

[13] According to *After Hour Welding, Inc. v. Laneil Management Co.*, 108 Wis. 2d 734, 324 N.W.2d 686 (1982), the extent to which the moving party was prejudiced by the alleged misconduct "will usually be a question of law which is not accorded deferential review." *Id.* at 741. Nonetheless, both *After Hour Welding* and *United States v. Farmer*, 717 F.3d 559 (7th Cir. 2013), acknowledge that the decision to order a new trial is generally discretionary. *See After Hour Welding*, 108 Wis. 2d at 740-41; *Farmer*, 717 F.3d at 565. We need not resolve this tension as to the applicable standard of review here because, even applying a de novo standard of review, we would agree with the circuit court that the comments testified to by the alternate juror were not prejudicial.

presumptively prejudicial and do not require retrial under the circumstances of this case.

¶40     First, as to the effect of some of the jurors' vacation schedules on deliberations, there is no evidence that any of the jurors were coerced or threatened to reach a verdict quickly. *See State v. Echols*, 175 Wis. 2d 653, 666, 499 N.W.2d 631 (1993). Time pressures due to the jurors' schedules rarely amount to the "outside influence" necessary to render a verdict invalid. *Cf. State v. Miller*, 2009 WI App 111, ¶63, 320 Wis. 2d 724, 772 N.W.2d 188 (juror's impending departure for a fishing trip did not warrant an evidentiary hearing regarding the validity of the verdict); *State v. Edelburg*, 129 Wis. 2d 394, 400, 384 N.W.2d 724 (Ct. App. 1986) (rejecting argument that a juror's concern about a business commitment the next day caused a likelihood that the verdict was coerced). The fact that the jury was polled immediately after announcing the verdict, with each juror individually announcing his or her vote of guilty, eliminates any uncertainty in this regard. *See Echols*, 175 Wis. 2d at 668.

¶41     Second, the foreperson's statement urging the other jurors, prior to the close of evidence, to "start deliberations now because we already know how this case is going to go," while inappropriate, does not persuade us that the verdict was likely tainted. Jane acknowledged the foreperson had not stated to the other jurors how the foreperson planned to vote, and the other jurors apparently dissuaded her from further discussing the case prior to deliberations. Moreover, the fact that some pre-deliberation discussion had occurred among the jurors does not necessarily mean that the verdict must be set aside. *Farmer*, 717 F.3d at 565-66. Our system recognizes that it is "virtually impossible for a human being serving as a juror not to form a preliminary opinion about a case while the evidence is presented," and we count on the circuit court's final instructions to the

jurors and the gravity of group deliberations to ameliorate the effect of any such notions regarding the disposition of the case. ***Id.***

¶42   Finally, there appears to have been some discussion among certain jurors as to which members of the jury panel were possibly sympathetic to Silva, and therefore suitable, in those jurors' minds, to be selected as alternates. Importantly, Silva glosses over Jane's testimony that the (incorrect) belief in the jury room was that the prosecution and the defense would each select one juror to serve as an alternate, much in the way the parties are able to strike jurors after voir dire.[14]   The existence of this mistaken belief casts a considerably different light on

---

[14]  Jane's testimony in this respect was as follows:

> Q   All right.  I will preface my next statement or question.  This is not like an exact quote.  In one of the things that were provided to the Court it was portrayed that you felt that other jurors were opening discussion on how to eliminate.  When you say the phrase how to eliminate, I don't know if that's an exact quote or a summary or an interpretation of something but how to eliminate.  Can you give me an example of anything you heard where somebody said this is specifically how a juror is eliminated or becomes an alternate?
>
> A   Basically how, like, the prosecution and the defense, they watch us and the people that are the other detectives and stuff in there were watching out throughout the whole trial.  So they were looking to see who was sympathetic.  So one got to pick one and, like, the defense would get to pick one, and the prosecution would get to pick one.
>
> Q   Okay.  At any point did you feel that the prosecution had identified you as someone that they wanted to strike as an alternate juror?
>
> A   I don't think so.

Jane was subsequently asked whether she had an understanding of how alternate jurors were actually selected.  She said she believed it had been a random drawing but admitted, "I don't know how it works."

22

the discussion. It suggests the jurors may have been hypothesizing about which jurors the parties would select to be alternates, rather than making an effort to have those jurors perceived as sympathetic to Silva relegated to alternate status by the jury itself. Again, while this discussion between the jurors was no doubt inappropriate, we agree with the circuit court that it was too vague and speculative a basis upon which to conclude the statements were prejudicial.

*IV. New Trial in the Interest of Justice*

¶43     This court may grant a new trial in the interest of justice under WIS. STAT. § 752.35. Such reversals are rare and are reserved for exceptional cases. ***State v. Kucharski***, 2015 WI 64, ¶41, 363 Wis. 2d 658, 866 N.W.2d 697. This court may reverse the judgment if it "appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." Sec. 752.35.

¶44     Silva invokes both grounds for an interest-of-justice reversal here. However, his arguments as to why relief is warranted under WIS. STAT. § 752.35 merely duplicate his arguments regarding the adequacy of the jury instructions, the conduct of the jurors, and the sufficiency of the evidence. We have determined that none of these arguments succeed on their merits. Accordingly, there is no basis to conclude reversal in the interest of justice is warranted. "Zero plus zero equals zero." ***State v. Lock***, 2012 WI App 99, ¶124, 344 Wis. 2d 166, 823 N.W.2d 378.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.